Filed 7/30/13; pub. order 8/26/13 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO CITIZENRY GROUP, | D059962 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2010-00099703-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed in part and reversed in part.

Coast Law Group, Christian C. Polychron and Marco A. Gonzalez for Plaintiff and Appellant.

Thomas E. Montgomery, County Counsel, and James R. O'Day, Deputy County Counsel, for Plaintiff and Respondent.

Starting in 2006, defendant County of San Diego (County) began exploring ways to encourage the growth of local grapes and the wine industry in the eastern region of the county by adopting regulatory amendments streamlining the winery approval process and

allowing small boutique wineries "by right." As part of this process, the County Board of Supervisors (BOS) certified a final environmental impact report (FEIR) under the California Environmental Quality Act (CEQA) for the Tiered Winery Zoning Ordinance Amendment Project (Project). Finding the Project might have significant, unmitigated environmental impacts, the BOS adopted a statement of "overriding considerations" for the Project.

Plaintiff San Diego Citizenry Group (SDCG) is a corporation that was formed to oppose the Project. In opposing the Project, SDCG asserted the FEIR was insufficient. After the County approved the FEIR, SDCG filed a petition for writ of mandamus, seeking to compel the County to rescind the Project, decertify the FEIR, and set aside its Project-related approvals and findings. The court denied the petition.

On appeal, SDCG asserts the FEIR (1) had an inadequate discussion of mitigation measures; (2) failed to adequately address a measure adopted in 2008 to mitigate boutique wineries' traffic impacts on private roads; (3) failed to provide sufficient information about the Project's significant impacts; (4) provided insufficient information regarding impacts to water supplies; (5) had a misleading discussion of grading permits; and (6) included an inadequate statement of overriding considerations. SDCG also asserts the Project is inconsistent with the County's General Plan, and the costs SDCG was charged for preparing the administrative record should be reduced to exclude transcripts of planning commission hearings. We reduce the cost of preparing the administrative record by $6,067.94, that amount constituting the cost of preparing

2

transcripts of hearings by the County's planning commission that were never considered by the BOS in adopting the FEIR. In all other respects we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2006 the County began exploring ways to promote the growth of grapes and the related wine industry. The BOS directed staff to "investigate options that would allow boutique wineries to expand and operate successfully by right without burdensome regulations." At that time, all visitor-serving/retail wineries in the unincorporated areas zoned A70 (Limited Agriculture) and A72 (General Agriculture) required discretionary major use permits.

The County subsequently received public comments regarding allowing boutique wineries by right. "Issues of concern" included traffic and related safety impacts of allowing visitor-serving wineries by right on privately owned rural roads, which "are often unimproved and do not meet County road standards."

In April 2008 the BOS certified a mitigated negative declaration under CEQA and adopted an ordinance, over contrary advice from County Counsel and staff, which allowed boutique wineries in the A70 and A72 zones, and found the project did not have any significant effect on the environment. Under the 2008 ordinance, boutique wineries were allowed by right (without a discretionary permit) on public roads. However, either an administrative permit or a private road maintenance agreement was required for boutique wineries located on private roads.

In May 2008 the BOS repealed the 2008 ordinance, determining that an EIR was necessary to address potential significant environmental impacts. In doing so, the BOS

3

found "[t]here exists information indicating that potentially significant environmental impacts could occur from the establishment and operation of boutique wineries that could threaten the public health and safety . . . ."

Thereafter, the BOS amended the zoning ordinance to reintroduce the boutique winery use type and to require that boutique wineries obtain only discretionary administrative permits instead of the more costly and burdensome major use permits. At the same time, the BOS directed staff to develop a tiered winery ordinance allowing "By-Right Boutique Wineries" and to prepare an EIR for the Project. The Project objectives, which are set forth in the draft and final versions of the EIR, are as follows: (1) encourage the growth of the wine industry in the County of San Diego; (2) streamline and clarify the approval process for the operation of wineries; (3) provide regulatory tiers that correspond to the different major phases in the growth of a winery, while providing for operational flexibility and incremental growth within each tier; (4) encourage property owners to retain agricultural lands in production; (5) encourage the farming of crops that use less water; (6) provide a winery category that allows wine tasting and direct sales to the public by right; (7) minimize the potential for conflicts between winery operations and adjacent land uses; (8) support local agriculture and encourage the production of local grapes; and (9) create a market for the use of locally grown grapes.

A draft EIR (DEIR) for the Project was circulated for public review starting in July of 2009. The DEIR concluded that by approving an unlimited amount of future wineries as a matter of right the Project would cause 22 different types of significant and unmitigated environmental impacts in seven different resource categories: air quality,

4

biological resources, cultural resources, hydrology and water quality, noise, transportation/traffic, and water supply/groundwater supply. The DEIR also identified three project alternatives: (1) enhanced ministerial enforcement that would require a "Compliance Checklist" that would provide documentation that the standards and limitations in the current zoning ordinance, including those that avoid or mitigate significant impacts, have been met; (2) a limited five-year by-right ordinance that would require evaluation of the by-right ordinance over a five-year period to collect and document data to determine the location and growth of wineries, and to evaluate whether to continue or modify the ordinance; and (3) the no project alternative, which would leave the zoning classifications for wineries unchanged. The DEIR concluded that each of the three project alternatives would be environmentally superior to the by-right ordinance.

The County also considered the experience of other counties to evaluate the magnitude of impacts that could reasonably be expected to result from allowing the creation of boutiques wineries by-right. The County surveyed San Diego and Riverside County (focusing on the Temecula area) wineries for data about technical, economic and environmental characteristics. The survey data was used to analyze impacts to air quality, noise, traffic trip generation and water supply. Section 5.0 of the FEIR, in the list of references used, referenced, or relied upon in its preparation, identified a 2005 research study titled, "Economic Impact of Wine and Vineyards in Napa County"; and 2009 personal communication with planners in Napa County. The county researched trip generation rates for Napa, Sonoma, Santa Barbara, San Luis Obispo, Placer and Amador

County wineries. That research revealed that those counties had not developed formal trip generation rates for use in determining traffic impacts. There was public testimony at the at the August 4, 2010 BOS hearing that referred to Placer County's experience with tasting rooms and Paso Robles' experience with winery growth. A chart was prepared for the FEIR from a survey of winery regulations in California counties and there were County planner notes of discussions with a Napa County representative. Finally, the County relied upon an article on water use at sample California wineries.

After the circulation and comment period, the County evaluated and responded to public comments. Among those who submitted comments was SDCG which stated (1) the discussion of impacts to imported water supplies was insufficient; (2) the discussion of impacts to groundwater supplies was insufficient; (3) the discussion of mitigation measures was insufficient; and (4) a water supply assessment must be prepared. Of significance to this appeal, the County responded that "[a]dditional impact avoidance measures were not incorporated into the Proposed Project because these measures would likely result in in the need for winery operators to obtain other permits and would be inconsistent with the Project objectives. Wineries required to obtain follow-on discretionary permits such as a grading permit would be subject to CEQA and would be required to mitigate for associated impacts. Therefore it was determined that no other avoidance measures were necessary."

Additional studies were performed and the County reviewed and made changes to subsection 2.7 of the DEIR, which addresses impacts to water supplies. Specifically, the changes to subsection 2.7 of the DEIR addressed impacts caused by (1) a significant

6

increase in demand for "water on lands not currently irrigated at a time when rainfall levels are below average and statewide drought conditions have resulted in cutbacks of imported water"; and (2) use of groundwater pollutants on grape crops.

On April 22, 2010, the County provided a new notice of availability and recirculated the revised subsection and solicited public comment. Public comments in response were received, evaluated, responded to and included in the FEIR.

Before the BOS considered the revised DEIR, the County Planning Commission considered the DEIR and related regulatory amendments during two public meetings in which both Project proponents and opponents participated. SDCG, a California corporation formed specifically to challenge the Project, "participated extensively at every stage of the Project's lengthy administrative history." Among the comments provided by SDCG and others were (1) the FEIR was inadequate; (2) the BOS could not lawfully make findings that, under CEQA, were required to be made before the BOS could certify the project; and (3) the Project could not be approved in compliance with the County's General Plan.

On August 4, 2010, the BOS considered and unanimously approved certification of the Project FEIR. Finding that the benefits of the Project outweighed its unavoidable environmental impacts, the BOS approved a statement of overriding considerations as authorized by Public Resources Code[1] section 21023 and California Code of Regulations, title 14, section 15093, subdivision (a)(3). The statement identified six

---

1   All further undesignated statutory references are to the Public Resources Code.

7

regulatory, agricultural and economic benefits making the unavoidable environmental impacts identified in the FEIR acceptable. Specifically, the statement found as to as to regulatory benefits that: "The Proposed Project would amend the zoning ordinance to streamline and clarify the approval process for the operation of wineries and provide regulatory tiers that correspond to the different major phases in the growth of a winery. Providing tiers of winery operations that are permitted by right eliminates costly and time consuming discretionary reviews that might otherwise discourage the establishment or expansion of wineries within San Diego County."

As to agricultural benefits, the statement provides that: (1) "[p]roviding an opportunity for tasting and direct sales will promote the economic viability of grape crops and encourage the retention of grape crops in production to serve the local and regional markets"; (2) "wine grapes are not a water intensive crop, requiring only approximately one half the amount of water of avocado crops" and (3) the Project would therefore "benefit the County by encouraging a low water-use crop on agricultural lands that might otherwise be developed with a more water intensive crop, thereby reducing the overall demand for water during a period of potential water shortages and supporting the continued viability of agricultural lands."

The statement identified three economic benefits: (1) the Project "will benefit San Diego County by promoting the County as a wine producing region and supporting economic growth of visitor serving businesses such a restaurants, cafes and lodging facilities"; (2) the Project "will foster economic growth by contibuting to the maintenance and/or expansion of the agricultural industry in San Diego County"; and (3) the Project

8

"will benefit the County by encouraging tourism and creating greater local employment opportunities."

The BOS found each benefit to be a separate and independent basis for the Project approval.

On that same date, the BOS also approved a County zoning ordinance and General Plan amendments implementing the Project. Within the County's A70 and A72 agricultural zones, the amendments created a tiered winery regulatory framework that added a "Small Winery" classification (wineries producing up to 120,000 gallons of wine per year), and made changes to the provisions governing the "Wholesale Limited Winery" and "Boutique Winery" classifications (wineries producing up to 12,000 gallons of wine per year, the latter classification having wine tasting facilities). The most significant changes allowed wholesale limited wineries to convert to boutique wineries and eliminated the administrative permit requirement for on-site sales and tasting rooms at boutique wineries.

The zoning ordinance also placed the following restrictions on boutique wineries: "A Boutique Winery must operate as a Wholesale Limited Winery for at least one year prior to operating as a Boutique Winery. [¶] The existing wine production limit (less than or equal to 12,000 gallons annually) remains unchanged. [¶] Of the total fruit in winemaking, a minimum of 75 percent shall be grown within San Diego County, a minimum of 25 percent shall be grown on the premises, and a maximum of 25 percent may be grown outside of San Diego County. [¶] Boutique Wineries continue to share the same limitations on the size of on-site structure(s) used in the production of wine as

9

Wholesale Limited Wineries, but are allowed one on-site tasting/retail sales room that may operate from 10:00 A.M. until legal sunset seven days a week. The tasting/retail sales room shall be accessory to wine production and shall not exceed 30 percent of the total squarefootage of the structure used for wine production. [¶] Events, including but not limited to weddings and parties, and amplified sound are prohibited. [¶] The sale and consumption of pre-packaged food is allowed on the premises. Catered food service is allowed, but no food preparation is allowed at a Boutique Winery. [¶] A minimum of six parking spaces shall be provided for customers and a minimum of three spaces shall be provided for employees and operations. No parking is allowed off the premises. [¶] The on-site driveway and parking area shall not be dirt. The on-site driveway and parking area may be surfaced with chip seal, gravel, or an alternative surfacing material such as recycled asphalt suitable for lower traffic volumes. [¶] Outdoor eating areas shall be limited to a maximum of five tables and provide seating capacity for no more than 20. [¶] Vehicles with a capacity in excess of 12 passengers are not allowed."

The amendments allowed boutique wineries by right, meaning without a discretionary zoning permit, and thus without environmental review, unless the activity necessitated some other type of discretionary approval.

B. *Procedural Background*

On September 3, 2010, SDCG filed a petition for writ of mandate and complaint for injunctive relief challenging the certification of the FEIR and requested that the County prepare the administrative record. The County prepared a record consisting of 5,648 pages and in December 2010 gave notice of certification of the record. Thereafter,

10

the County moved for an order determining and directing payment of costs for the administrative record. SDCG opposed the motion and the County filed a reply.

On April 15, 2011, the court issued its ruling in favor of the County, denying the writ petition and ordering SDCG to reimburse the County for the costs of record preparation. In doing so, the court found the FEIR "suffices as an informational document. The [BOS] was, by the EIR, adequately informed about the consequences of its decisions. The public (including petitioner) was provided with adequate information regarding the decisions of their elected leaders. That is where the judicial inquiry under CEQA ends; any further remedy for petitioner (or those who share its views regarding wineries in the backcountry of San Diego County) lies at the ballot box when the Supervisors stand for re-election. . . . It is not within the province of a judicial officer to second guess the policy decisions of the members of the [BOS], so long as there was substantial evidence to support their decisions. The court finds that there was." With regard to the order directing SDCG to pay the cost of preparation of the administrative record, the court found that "petitioner had the option of preparing the record itself; and . . . there is no well-heeled real party in interest (such as a developer) to bear the expense associated with that exercise. Groups like petitioner are free to exercise their petition rights, but as has been often said in other contexts, freedom is not free."

## DISCUSSION

### I. *STANDARD OF REVIEW*

Review of the FEIR is governed by section 21168.5. While the basic nature of review is in ordinary mandamus, CEQA (Cal. Code Regs., tit.14, § 15000 et seq.)

11

(Guidelines)) is unique in that it requires substantial evidence in support of certain evidentiary determinations.  Under section 21168.5, the court considers whether there was an abuse of discretion, which is established if the agency has not proceeded in a manner required by law or if the decision is not supported by substantial evidence.  (§ 21168.5.)

A.  *Substantial Evidence*

Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."  (Guidelines, § 15384, subd. (a).)  When a court determines an agency's decision was supported by substantial evidence, it grants greater deference to the agency's substantive factual conclusions. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights*).)

Courts presume that the agency's decisions are correct, and the challenger bears the burden of proving the contrary.  (*State Water Resources Control Board Cases* (2006) 136 Cal.App.4th 674, 723.)  A court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d. 553, 564.)  A court "'must resolve reasonable doubts in favor of the administrative finding and decision'" (*Laurel Heights, supra*, 47 Cal.3d at p. 393), even though other conclusions might be reached from the same body of evidence.  (*Ibid.*)  "'[A]n appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why

12

it is lacking.  Failure to do so is fatal.'"  (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934.)

A court's task is not to weigh conflicting evidence and determine who has the better argument.  These questions are left to the discretion of the agency and its environmental consultants; it is they who decide how best to prepare an EIR to achieve CEQA's informational purpose.  The County's determinations regarding disputed questions of fact are entitled to the same deference appellate courts give to the factual findings of trial courts.  (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573; *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1042.)

B.  *Failure To Proceed in a Manner Required By Law*

An abuse of discretion may also be established if the agency fails to proceed in a manner required by CEQA.  When an agency fails to include information mandated by CEQA in the environmental analysis, the agency fails to proceed in a manner required by law.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*); *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236.)  However, where the agency includes the relevant information, but the *adequacy* of the information is disputed, the question is one of substantial evidence. (*Vineyard, supra,* 40 Cal.4th at p. 435; *Laurel Heights, supra,* 47 Cal.3d at p. 393.)

For example, in *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936 (*Ebbets Pass*), the court considered whether the agency had proceeded in a manner required by law when it determined whether the application of

13

a particular herbicide was reasonably foreseeable and thus must be discussed in the EIR. By way of comparison, the correctness of the factual conclusions such as when the herbicide would likely be applied in the future, was an issue to be reviewed under substantial evidence. (*Ibid.*)

The determination of whether an agency has proceeded in the manner required by law is based on a review of the record as a whole: "Where some facts show a failure to comply, but the record as a whole supports a finding of compliance, courts should find compliance based on the evidence in the whole record." (2 Kostka & Zischke, Cal. Environmental Quality Act (2d ed. 2011) § 23.35, p. 1175; see also *Ebbetts Pass, supra,* 43 Cal. 4th at p. 945.)

The same presumptions apply to review under this standard as under the substantial evidence standard. That is, the EIR is presumed to be legally adequate and the party challenging the legal adequacy bears the burden of establishing otherwise. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 723.)

C. *Prejudicial Abuse of Discretion*

A reviewing court looks not for perfection, but for good faith and substantial compliance. (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 899 ["'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive,'" quoting *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712].) An error in procedure by itself is not the basis for an adverse

judicial determination. There must be a prejudicial abuse of discretion. "[T]here is no presumption that error is prejudicial." (§ 21005, subd. (b).)

The County's decision to approve the Project despite its significant environmental impacts is a discretionary policy decision, entrusted to it by CEQA, which will be upheld as long as it is based on findings of overriding considerations that are supported by substantial evidence. (*Cherry Valley Pass Acres & Neighbors* v. *City of Beaumont* (2010) 190 Cal.App.4th 316, 357; see also *City of Long Beach* v. *Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 897 (*City of Long Beach*); §§ 21002, 21083.)

## II. *ANALYSIS*

### A. *The County's Policy Determination*

According to SDCG, the BOS did not make a "preliminary policy determination" regarding the Project's objectives, and thus the drafters of the FEIR could not rely on those objectives in analyzing the feasibility of mitigation measures. This contention is unavailing.

After considering various proposals to encourage the growth of grapes and the related wine industry for more than two years, in June 2008 the BOS directed staff to develop a "'tiered winery ordinance' that would include, among other uses, 'By-Right' Boutique Wineries," and "prepare an Environmental Impact Report to analyze the potential environmental impacts of such an ordinance." The BOS properly delegated environmental review of the proposed Project to agency staff, and staff included a "statement of the objectives sought by the proposed project" in the EIR. (Guidelines, § 15124, subd. (b).)

15

B.  *Discussion of Mitigation Measures*

SDCG also contends that even if the BOS made a preliminary determination regarding the Project objectives, the objectives have been given "an impermissibly narrow construction" to limit discussion of mitigation measures.  We reject this contention.

"CEQA does not restrict an agency's discretion to identify and pursue a particular project designed to meet a particular set of objectives."  (*California Oak Foundation* v. *Regents of University of California* (2010) 188 Cal.App.4th 227, 276-277.)

"Although a lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose and need not study alternatives that cannot achieve that basic goal."  (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1166.) "For example, if the purpose of the project is to build an oceanfront resort hotel [citation] or a waterfront aquarium [citation], a lead agency need not consider inland locations."  (*Ibid.*)  Likewise, a lead agency need not consider lower density housing that would defeat the underlying purpose of providing affordable housing.  (*Sequoyah Hills Homeowners Assn.* v. *City of Oakland* (1993) 23 Cal.App.4th 704, 715.)

Here, the underlying purpose of the Project was to streamline the winery approval process to promote the growth of local grapes and the related wine industry.  In compliance with CEQA, the FEIR thus properly identified and discussed mitigation measures that allowed a by-right use without further discretionary approvals as well as

16

Project alternatives, including an "Enhanced Ministerial Enforcement Alternative" and a "Limited Five Year By-Right Alternative."

Also, as discussed, *ante*, the County used information from the experiences of other counties to evaluate the magnitude of impacts that could be expected to result in from allowing boutique wineries by-right. That information was used in the FEIR to analyze impacts to air quality, noise, traffic trip generation and water supplies.

C. *Adequacy of Discussion of Mitigation Measures*

SDCG acknowledges that feasible mitigation measures were incorporated into the proposed Project and that the "Response to Comments" section of the FEIR discusses the infeasibility of a traffic mitigation measure contained in the 2008 ordinance (2008 traffic measure). However, SDCG asserts the FEIR is inadequate because it fails to discuss any "additional" mitigation measures in "meaningful detail."

In support of this proposition, SDCG relies on *Laurel Heights, supra,* 47 Cal.3d 376. SDCG's reliance on *Laurel Heights* is unavailing. That case did not conclude an EIR was deficient because it failed to discuss "additional" mitigation measures. *Laurel Heights* found an EIR deficient because it failed to discuss project alternatives. (*Laurel Heights, supra,* 47 Cal.3d at pp. 404-406.) By contrast, the FEIR in this case discusses project alternatives.

SDCG also contends there is no substantial evidence that "other" mitigation measures were infeasible. CEQA does not, however, require discussion of every mitigation measure the agency rejected as infeasible. (See *Santa Clarita Organization or*

17

*Planning the Environment* v. *City of Santa Clarita* (2011) 197 Cal.App.4th 1042, 1054-1056 (*Santa Clarita*).)

*Santa Clarita* is instructive. That case involved a hospital and office building expansion project, which the city found would have unavoidable, unmitigated impacts on climate change even with the adoption of feasible traffic and air quality mitigation measures. The plaintiff there argued the FEIR and findings did not contain sufficient analysis to support the city's conclusion because neither showed the city "ever considered or analyzed any *other* mitigation measures" (*Santa Clarita, supra,* 197 Cal.App.4th at p. 1054, italics added), including the 50 generalized mitigation measures proposed by appellant. (*Id.* at p. 1055.) Noting that the plaintiff did "not cite any specific authority indicating that the city was required to set forth an analysis of each mitigation measure that it considered and rejected as infeasible" (*id.* at p. 1054), the court found appellant's position, that the city was required "to explore in writing further [nonspecific] mitigation measures . . . regardless of their feasibility, is simply not supportable under the law." (*Id.* at pp. 1055-1056, fn. omitted.)

Here, SDCG does not identify any "additional" mitigation measures that would have been feasible in light of the Project's objectives. Indeed, SDCG does not cite any authority supporting its claim that the FEIR is deficient because it does not discuss every infeasible mitigation measure. "''CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects.''" (*Concerned Citizens of South Central L.A. v. Los*

18

*Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 841.) "'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.) Mitigation measures that cannot be legally imposed or enforced need not be proposed or analyzed. (*Tracy First v. City of Tracy, supra,* 177 Ca1.App.4th at p. 938; § 21081.6, subd. (b).) The FEIR complies with these requirements.

As we have discussed, the Project is a zoning ordinance amendment to allow the by-right operation of certain wineries. The FEIR acknowledges that by-right uses are not subject to discretionary zoning approvals, and thus are not subject to environmental review, unless some other discretionary approval is required. Moreover, the FEIR identifies and discusses specific mitigation measures that may be imposed and enforced if a winery owner's action requires a discretionary permit, such as a grading or building permit.

The FEIR identifies 11 impact avoidance measures built into the zoning ordinance amendments to address the potential impacts of allowing by-right wineries. The impact avoidance measures: (1) prohibit on-site events, including weddings and parties; (2) limit the maximum floor area allowed for structures used in wine production; (3) require at least 25 percent of grapes used for winemaking be grown on site; (4) limit the maximum amount of wine production; (5) require winery operations to comply with the County noise ordinance; (6) limit the maximum floor area allowed for tasting rooms at boutique wineries; (7) limit the preparation and service of food at boutique wineries; (8) limit operating hours for tasting rooms at boutique wineries; (9) prohibit amplified sound at

19

boutique wineries; (10) limit the size of outdoor-eating areas at boutique wineries; and (11) limit the size of passenger vehicles allowed at boutique wineries.

As stated in the "Response to Comments" section of the FEIR: "Additional impact avoidance measures were not incorporated into the Proposed Project because these measures would likely result in the need for winery operators to obtain other permits and would be inconsistent with the Project's core objectives."

D. *Substantial Evidence Supports the Discussion of Mitigation Measures*

SDCG also fails to demonstrate there is no substantial evidence supporting the FEIR's discussion of mitigation measures. Substantial evidence is defined as "'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'" (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 486.) In reviewing an agency's decision for substantial evidence, courts "'must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision.'" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 985 (*California Native Plant*).) This standard of review flows from the fact that "the agency has the discretion to resolve factual issues and to make policy decisions." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 120.)

"''As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why

20

it is lacking.  Failure to do so is fatal.  A reviewing court will not independently review the record to make up for appellant's failure to carry his [or her] burden.'"'  (*Pfeiffer v. City of Sunnyvale City Council* (2011)  200 Cal.App.4th 1552, 1572.)

SDCG does not set forth the evidence supporting the FEIR's feasibility findings and demonstrate why it is insufficient.  Rather, SDCG only argues that a response to a comment in the FEIR "suggests that, while additional feasible measures may exist, it was the decisionmaker's role [*sic*] to come up with them in the first instance, and to then determine whether to adopt them or to reject them as infeasible."  The cited response correctly states that the decision maker must determine "whether or how to mitigate . . . as discussed in Section S.4 of the draft EIR."  Section S.4 explains that the Project's impacts "cannot be fully mitigated to below a level of significance and the decision-makers would need to decide whether any of the project alternatives would substantially reduce significant impacts, while still meeting the key project objectives, or whether to adopt a statement of overriding considerations in order to approve the project."

The response to that comment accurately describes the scope of the BOS's discretion under CEQA.  Under CEQA, the BOS had to determine whether "economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the environmental impact report."  (§ 21081, subd. (a)(3); see also *California Native Plant, supra,* 177 Cal.App.4th at p. 1001.)  "'"[F]easibility" under CEQA encompasses "desirability" to the extent that desirability is

21

based on a reasonable balancing of the relevant economic, environmental, social, and technological factors.'" (*California Native Plant, supra,* 177 Cal.App.4th at p. 1001.)

CEQA provides two "junctures" for findings regarding the feasibility of project alternatives. First, alternatives are determined to be potentially feasible in the EIR. (*California Native Plant, supra*, 177 Cal.App.4th at p. 981.) Second, in deciding whether to approve the project, the decision maker determines whether an alternative is actually feasible. (*Id*. at p. 981.) "At that juncture, the decision makers may reject as infeasible alternatives that were identified in the EIR as potentially feasible." (*Ibid.*)

The BOS rejected the Project alternatives, finding within its discretion that none would achieve the core objectives to the same extent as the Project. SDCG's disagreement with the BOS's policy determination is not a basis for setting aside the FEIR. (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1270.) The question is whether, given the Project objectives of encouraging the growth of agriculture and the wine industry by streamlining the approval process and permitting Boutique Wineries by right, CEQA requires the discussion and incorporation of mitigation measures that would defeat those very same objectives. "'CEQA does not, indeed cannot, guarantee that [an agency's] decisions will always be those which favor environmental considerations.'" (*Laurel Heights, supra,* 47 Ca1.3d at p. 393.)

E. *Discussion of 2008 Traffic Measure*

Although SDCG acknowledges the FEIR discusses and rejects the 2008 traffic measure that addressed impacts to private roads, SDCG claims the discussion is inadequate. However, the FEIR identifies and discusses the Project's potential impacts

22

and determines there may be a significant impact on private roads, due to road capacity and design issues. The Project also provides mitigation against traffic impacts by limiting the size of passenger vehicles that may enter into boutique wineries, prohibiting large-scale events, limiting the size and production of wineries, and limiting operating hours. Further, in preparing the FEIR the County conducted surveys of San Diego and Riverside County wineries as to traffic trip generation impacts, and researched the experience of six other counties as to traffic impacts.

SDCG relies on *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342 (*Napa Citizens*) for the proposition that the FEIR is deficient. That case does not support SDCG's position. In *Napa Citizens,* the court held that an agency could reject a previously adopted mitigation during subsequent review of a project, as long as it stated "a legitimate reason for deleting" (*id.* at p. 359) the measure and supported that statement with "substantial evidence." (*Ibid.*)

SDCG contends the FEIR does not state a legitimate reason, supported by substantial evidence, for not incorporating the 2008 traffic measure into the Project. However, the 2008 traffic measure was adopted for a *different* project that did not add a purely by-right use. Moreover, the 2008 traffic measure was not incorporated into the Project for a legitimate reason—the measure was not consistent with a by-right use. By definition, a by-right use does not require discretionary zoning approvals, and the 2008 traffic measure required a permit for a boutique winery located on a private road. The 2008 traffic measure exempted such wineries from permitting requirements only where there was a maintenance agreement among the affected private property owners.

23

Requiring a private agreement is inconsistent with a by-right use, since the use would not be allowed if even a single affected landowner declined to enter into the agreement.

SDCG asserts the FEIR is deficient because it states in a response to a comment that such private "agreements between property owners to improve and maintain private roadways are not environmental issues, and therefore are not required by CEQA to be analyzed in the EIR." This is a correct statement of the law. Private actions, including private agreements, are not subject to review under CEQA. (Guidelines, § 15002, subd. (c) ["Private action is not subject to CEQA unless the action involves governmental participation, financing, or approval."].) "Under CEQA, 'the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons.'" (*Eureka Citizens for Responsible Government* v. *City of Eureka* (2007) 147 Cal.App.4th 357, 376.)

SDCG relies on *Santa Clarita Organization for Planning the Environment* v. *County of Los Angeles* (2003) 106 Cal.App.4th 715, where the EIR relied heavily on water entitlements in analyzing the "cumulative impact of past, present and probable future projects" (*id.* at p. 721), but in a response to a comment only "obliquely acknowledge[d] that the entitlements may not be all they seem." (*Id.* at p. 723.)

Unlike the comment in that case, the comment here adequately addresses the 2008 traffic mitigation measure, which had been discussed throughout the administrative proceedings. Because the response contains a similar level of detail as the comment and demonstrates a good faith analysis as to how the matter was addressed and analyzed, the response is sufficient. (*City of Long Beach, supra,* 176 Cal.App.4th at pp. 904-905.)

24

Substantial evidence also supports the rejection of the 2008 traffic measure. The Project's goal was to encourage the growth of grapes and the related wine industry by allowing a by-right use, and the high costs and lengthy delays associated with administrative permits—and the ramifications of requiring private agreements—were discussed at length during the administrative hearings and in the FEIR's responses to comments.

Speakers described small businesses in the unincorporated area as "struggling" and characterized the administrative permit process as "onerous," taking up to six months to complete, and costing tens of thousands of dollars. Private road agreements were described as private matters over which the County lacked control, and which relate to private liability, not road capacity or design issues.

F. *Discussion of Environmental Impacts*

SDCG also contends the FEIR fails to provide sufficient information regarding each of the Project's significant environmental impacts. In support of this proposition, SDCG cites *Californians for Alternatives to Toxics v. Department of Food & Agriculture* (2005) 136 Ca1.App.4th 1, 13 [pest control program]; *Vineyard, supra,* 40 Ca1.4th at pp. 449-450 [specific development]; *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Ca1.App.4th 1344, 1371 [airport expansion]; *Santiago County Water Dist. v. County of Orange* (1981) 118 Ca1.App.3d 818, 831 [sand and gravel operation]; *City of Antioch v. City Council* (1986) 187 Ca1.App.3d 1325, 1337 [extension of sewer and road]; *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33

25

Ca1.App.4th 144, 158 [mining operation]; *Napa Citizens, supra,* 91 Ca1.App.4th at p. 370) [specific plan amendment].)

None of these cases is on point, however, because none involved a project authorizing a by-right use over a large geographical area.

For instance, SDCG claims the FEIR failed to analyze significant environmental "impacts in relation to the most probable development patterns."  In support of this position, SDCG relies on *City of Antioch v. City Council, supra,* 187 Cal.App.3d 1325. However, that case involved a negative declaration prepared for a road and a sewer trunk line extension, and it was feasible to analyze impacts in relation to the most probable development patterns because the project area was confined to a small area in the vicinity of the improvements.  (*Id.* at p. 1329.)  The magnitude of the *441,000* acres of potential development in this case distinguishes it from *City of Antioch.*

Additionally, the County prepared a thorough DEIR and FEIR of over a thousand pages, analyzing seven significant impact categories and describing the potential effect across those 441,000 acres, in contrast to the negative declaration prepared in *City of Antioch.*  As we shall discuss, *post*, the FEIR's analysis complies with CEQA.

1. *Evaluation of the effects of the zoning amendments*

SDCG asserts the FEIR's analysis of significant impacts is inadequate because "best efforts" were not used to determine "where and how many by-right wineries may be developed" in the Project area.  This contention is unavailing.

CEQA Guidelines provide:  "An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed

26

in the light of what is reasonably feasible." (Guidelines, § 15151.) "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR." (Guidelines, § 15146. ) "An EIR on a project such as the . . . amendment of a comprehensive zoning ordinance . . . should focus on the secondary effects that can be expected to follow from the . . . amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow." (Guidelines, § 15146, subd. (b))

The FEIR identifies and discusses the secondary effects of the Project in seven resource areas. The FEIR found the effects to be significant, in part because future by-right wineries may not be subject to CEQA review and appropriate, project-specific mitigation. The FEIR thus served its purpose as a disclosure document, by informing decision-makers and the public of the potential environmental impacts of approving the Project. (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 748 ["CEQA simply requires that the public and public agencies be presented with adequate information to ensure that 'decisions be informed, and therefore balanced. ' [Citation.] The purpose of CEQA 'is not to generate paper.'"].)

2. *Efforts to predict future development*

The FEIR does not, as SDCG asserts, simply state that the level of development is unknown and then label each impact as significant without meaningful analysis or discussion. Rather, the County sought to determine future boutique winery development, based in part on the pattern of development of existing grape growers and wineries, focusing on Ramona, where existing wineries and grape growers are concentrated.

27

The County also sent out questionnaires to 26 existing wholesale limited wineries to inquire regarding the likelihood of conversion to boutique wineries should the Project be approved. Eleven responded. Of those, eight indicated an intent to convert. Three of the eight agreed to provide further information to County staff. The results of these surveys also were incorporated into the FEIR. Such information was used to identify and analyze the Project's potential significant environmental impacts.

SDCG focuses on the Project's impact on traffic, acknowledging that the FEIR projects how much traffic each new boutique winery will likely generate, determines the maximum number of wineries the Project area may accommodate before traffic impacts occur and assumes that this number will be exceeded. SDCG contends, however, that the FEIR is deficient because it does not disclose sufficient information regarding the severity of the impacts on "key roadway segments." This contention is unavailing.

The FEIR contains a traffic impact analysis and traffic impacts are discussed in subchapter 2.6 of the FEIR, which identifies specific circulation roadways in specific representative community areas where grape or wine production either already exists or would be more likely to occur because of local conditions. Using those roadway segments as representative of potential future development, the County conducted traffic studies and reached relevant conclusions, such as a determination that most winery patron traffic is generated on weekends, largely avoiding peak weekday congestion.

The transportation/traffic section incorporated data from the County's General Plan Update Circulation Element Framework and the San Diego Association of -0Govemments (SANDAG) to project "build-out" conditions in the future. Because trip

28

generation data from wineries has not been created even in such established winery areas as Napa, Sonoma, and Santa Barbara, the study reviewed three existing wineries in this region to determine trip generation data. The wineries were chosen in an attempt to find data representative of the most likely types of future development resulting from the Project.

The study then identified the County's traffic standards and regulations as a basis for determining levels of significance and the data was modeled into those criteria in order to reach conclusions about significant direct and cumulative traffic impacts. Thus, contrary to SDCG's assertion, the FEIR adequately analyzes the Project's traffic impacts on key roadway segments based on existing and projected development.

G. *Discussion of Impacts to Water Supplies*

SDCG contends that the FEIR provides "insufficient information regarding impacts to water supplies," relying on *Vineyard, supra,* 40 Cal.4th 412. In contrast to this case, however, *Vineyard* involved approval of a community plan for a large, mixed-use development project, having a defined size and projected water use. In that case, the California Supreme Court concluded the FEIR failed to provide a "plainly stated, coherent analysis of how the supply is to meet the demand" for the specific project. (*Id.* at p. 445.)

*Vineyard* does not require, as SDCG argues, that the FEIR for a zoning amendment predict the "total effect on water demands" in the Project area to adequately address water impacts. A conceptual EIR, such as one for a General Plan Amendment (GPA) to allow proposed development, meets *Vineyard's* requirements by identifying the

29

likely source of water for new development, noting the uncertainties involved, and discussing measures being taken to address the situation in the foreseeable future. (*Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1092.)

The FEIR here discusses water sources, notes the uncertainties involved, and addresses measures being taken through regional water planning. The County also surveyed San Diego and Riverside County wineries to obtain data as to impacts on water supplies.

SDCG asserts the discussion is inadequate because the FEIR "made no effort at all to project the Project's total effect on water demands" in the Project area because the FEIR does not estimate the number of boutique wineries that might be developed. The contention is belied by the record.

The FEIR analyzes, among other things, the use of water by existing grape growers and winery operators, and extrapolates from this information. The FEIR discusses projected declines in agricultural use in the area given the scarcity and cost of water, and states that one of the goals of the Project is to encourage crops that use less water, such as grapes. While the FEIR acknowledges, as it must, that there is no way to know how many by-right wineries might develop, the FEIR complies with *Vineyard's* directives by making findings "regarding incorporated mitigation measures, infeasibility of mitigation, and overriding benefits of the project [citation] as to each alternative prong of the analysis." (*Vineyard, supra,* 40 Ca1.4th at p. 434.)

Moreover, as discussed, *ante*, in adopting the FEIR the County considered information from other counties in evaluating the magnitude of impacts that could be

expected to result from allowing the creation of boutiques wineries by right. This included the FEIR's analysis of impacts to water supplies.

SDCG claims this is a "uniquely problematic" case because boutique wineries will be allowed by right and thus without further mitigation. However, CEQA does not mandate that every environmental impact be mitigated. Rather, "so long as it has made an informed decision in adopting a statement of overriding considerations, an agency need not require mitigation." (*Concerned Citizens of South Central L.A.* v. *Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 846.)

J. *Discussion of Grading Permits*

SDCG asserts the FEIR's discussion of grading permits is "materially misleading" and claims the FEIR suggests such permits could provide for mitigation of "every type of environmental impact associated with the winery." (Italics omitted.) According to SDCG, the FEIR "repeatedly" represents that significant environmental impacts "will be mitigated during the process of issuing Grading Permits" and this "incorrect and misleading information" affected the decisionmaking process. This contention is unavailing.

In fact, the FEIR expressly *acknowledges* that the grading permit process will not be used to mitigate every impact. The FEIR states: "The County acknowledges that, while possibly a source of future limited environmental review, the grading permit process does not mitigate all impacts." The FEIR states elsewhere: "Some future winery projects may be required to obtain a discretionary permit such as a Grading Permit . . . . However, mitigation may not always be feasible for these projects . . . ."

31

Thus, SDCG's contention the grading permit discussion is "materially misleading" is without merit. The grading permit discussion is factually correct and provides relevant information for the public and decisionmakers.

K. *The Statement of Overriding Considerations*

Because the FEIR concluded that the Project's significant environmental impacts would not be fully mitigated, the BOS adopted a "Statement of Overriding Considerations." (Guidelines, §§ 15093, 15091; § 21081.)! A statement of overriding considerations "'focuses on the larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like.'" (*Sierra Club* v. *Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222, disapproved on other grounds in *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499.) The purpose of such a statement is "to demonstrate the balance struck by the body in weighing the 'benefits of a proposed project against its unavoidable environmental risks.'" (*Ibid.*) The statement is adequate if supported by substantial evidence in the FEIR or in the record. (*Id.* at p. 1223.) "The override decision 'lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned.'" (*California Native Plant, supra,* 177 Cal.App.4th at p. 983.)

The BOS identified six separate benefits justifying approval of the Project, including the regulatory benefit of streamlining the winery approval process to promote the growth of wineries. It also identified two agricultural benefits, including (1) the retention of agricultural land by promoting the economic viability of grape crops, and (2)

encouraging low water crops (grapes). In addition, the BOS identified three economic benefits: (1) bringing revenue to the unincorporated area by promoting the wine producing region and supporting economic growth of visitor-serving businesses, such as restaurants, cafes, and lodging facilities; (2) supporting the growth of the regional economy by contributing to the maintenance and/or expansion of the agricultural industry, which is the fifth largest component of the County's economy and constitutes the 12th largest farm economy among counties nationwide; and (3) creating job opportunities relating to the expanding industry and tourism.

SDCG contends the BOS's statement of overriding considerations should be overturned because the FEIR is so deficient it does not provide a basis for making these findings. In support of this contention, SDCG relies on *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 79-80.) However, in *San Franciscans for Reasonable Growth,* the EIR so severely under-estimated the cumulative impacts of a specific development that the court found the decision maker had "no opportunity to deal with the true severity and significance of its impacts . . . on the whole spectrum of environmental concerns potentially affected by high-rise development." (*Id.* at p. 80.)

In contrast, the FEIR here relied on conservative assumptions, found significant environmental impacts and adequately apprised the decision maker of the severity of those impacts.

33

L. *Consistency with General Plan*

SDCG also asserts that allowing by-right wineries is inconsistent with the County's General Plan, which requires environmental review for developments within the environmentally constrained areas (ECA's) located in the Project area. We reject this contention.

First, although "there is no requirement that an EIR itself be consistent with the relevant general plan, it must identify and discuss any inconsistencies between a proposed project and the governing general plan." (*Napa Citizens, supra,* 91 Cal.App.4th at pp. 360-361.) The FEIR identified and discussed the asserted inconsistency and as part of the Project approval, the BOS considered and approved a GPA. The GPA, consistent with the determinations in the statement of overriding considerations, exempts the Tiered Winery Ordinance uses from the provisions of the ECA designations. Thus, SDCG's argument concerning the ECA designation is also without merit.

To the extent SDCG claims the BOS's decision to exclude wineries from the ECA provisions is itself inconsistent with the GPA, SDCG cannot show an abuse of discretion. A reviewing court accords "great deference" to an agency's determination that a project is consistent with its own general plan, recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.) "Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when

applying them, and it has broad discretion to construe its policies in light of the plan's purposes." (*Ibid.*) An agency's finding that a project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion. (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648.)

The party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable. (*California Native Plant, supra,* 177 Cal.App.4th at p. 987.)

Here, SDCG does not even attempt to make such a showing. Consequently, SDCG's assertion that the Project is inconsistent with the County's General Plan does not provide a basis for reversing the judgment.

M. *Order that SDCG Reimburse County for Costs of Hearing Transcripts*

SDCG asserts the court erred in ordering it to reimburse the County in the amount of $6,067.94 for the costs of planning commission hearing transcripts included in the administrative record because these transcripts were not before the BOS when it made its decision. We conclude the court erred in awarding the County $6,067.94 for preparing transcripts of County planning commission hearings.

Section 21167.6, subdivision (e)(4) requires the party preparing the record of proceedings to include "any transcript or minutes of proceedings before any advisory body to the respondent public agency *that were presented to the decisionmaking body prior to action on the environmental documents or on the project.*" (Italics added.)

35

Moreover, section 21167.6, subdivision (f) provides: "In preparing the record of proceedings, the party preparing the record shall strive to do so at reasonable cost . . . ."

It is undisputed that the transcripts of the planning commission hearings to which SDCG objects were not before the BOS at its August 4, 2010 hearing approving the project because they were not transcribed until four months later, in December 2010. Thus, under section 21167.6, subdivision (e), they were not required to be included in the record of the proceedings before the BOS.

The County asserts that because CEQA requires preparation of a complete record it risked losing this case by certifying an incomplete record. However, in light of section 21167.6, subdivision (e)'s explicit direction of what transcripts must be included in the record of proceedings, there was no risk that omission of these transcripts would have resulted in a default.

The County also argues that inclusion of these transcripts was proper because SDCG requested the County prepare "all documents, including transcripts . . . *relating to* Respondent's determination to approve [the Project]." However, use of the term "relating to" the Project is merely a recitation of the language of section 21167.6, subdivision (a), which requires a petitioner to request preparation of the record "relating to the subject of the action or proceeding."

The County's inclusion of these transcripts thus did not comply with CEQA's direction that in preparing the record the County must "strive to [prepare the record] at reasonable cost." (§ 21167, subd. (f).)

36

In support of its position that transcripts of the planning commission hearings were properly included in the record of proceedings, the County relies on *County of Orange* v. *Superior Court* (2003) 113 Cal.App.4th 1 (*County of Orange*). In that case, the trial court found that earlier EIR materials should not be included in the administrative record because they were "not before the 'county decision-makers' in [approving] the . . . redone EIR." (*Id.* at p. 7.) The Court of Appeal reversed, holding that section 21167.6, subdivision (e) "contemplates that the administrative record will include pretty much everything that ever came near a proposed development *or* to the agency's compliance with CEQA in responding to that development." (*Id.* at p. 8.)

However, *County of Orange* is distinguishable. The Court of Appeal there held that the first EIR materials were properly included in the record because they were part of the history of the "project" leading up to approval of a final EIR. (*County of Orange, supra,* 113 Cal.App.4th at pp. 9-10.) However, in this case the planning commission transcripts were not part of the history of approval of the FEIR because they did not come into existence until *after* the County's approval of the FEIR in August 2010.

DISPOSITION

We conclude the court erred in awarding the County $6,067.94 for preparing transcripts of the County planning commission hearings. In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO CITIZENRY GROUP, | D059962 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2010-00099703-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Respondent. | ORDER CERTIFYING OPINION FOR PUBLICATION |

The opinion filed July 30, 2013, is ordered certified for publication.

NARES, Acting P. J.