Filed 12/16/13  Sierra Club v. Imperial County CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, | D062545 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 97911) |
| IMPERIAL COUNTY et al., | |
| Defendants and Respondents, | |
| UNITED STATES GYPSUM COMPANY, | |
| Real Party in Interest and Respondent. | |

APPEAL from an order of the Superior Court of Imperial County, Donal B. Donnelly, Judge.  Reversed and remanded with directions.

California Environmental Law Project, Laurens H. Silver; Law Offices of Julie M. Hamilton and Julie M. Hamilton for Plaintiff and Appellant Sierra Club.

Office of Imperial County Counsel, Michael L. Rood, County Counsel, Geoffrey Holbrook for Defendants and Respondents Imperial County and Imperial County Planning Commission.

Elkins Kalt Weintraub Reuben Gartside, John M. Bowman, C.J. Laffer, for Real Party in Interest and Respondent United States Gypsum Company.

Appellant Sierra Club appeals from an order in favor of respondents Imperial County, the Imperial County Planning Commission (collectively County), and real party in interest United States Gypsum Company (USG) in which the trial court denied Sierra Club's motion for a supplemental or amended writ of mandate and discharged a writ it had issued on March 29, 2001. In that proceeding, Sierra Club sought to compel County to decertify its final environmental impact report (FEIR) under the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000, et seq.) for the expansion and modernization of USG's wallboard manufacturing plant and quarry in Plaster City, California (the project) and set aside its approval of mitigation measures for the potential significant groundwater impacts resulting from the Project's increased groundwater pumping.

On appeal, Sierra Club contends: (1) it exhausted its administrative remedies in challenging the legal feasibility or sufficiency of County's mitigation measures; (2) the record lacks substantial evidence that the adopted mitigation measures with respect to

_____

[1]     Statutory references are to the Public Resources Code unless otherwise specified. The draft EIR in this case was in fact a joint draft EIR and Environmental Impact Statement (EIS) because the project required approvals from the Bureau of Land Management and other federal agencies that were subject to the National Environmental Policy Act. (42 U.S.C. § 4321 et seq.) We will refer to the draft EIR/EIS and final EIR/EIS as the DEIR and FEIR respectively.

2

groundwater levels and quality will reduce the project's impacts to a level of insignificance; and (3) County's mitigation measures with respect to groundwater pumping are not legally feasible to the extent they contravene California common law concerning the priority rights of overlying domestic water users and a County groundwater ordinance.

We hold Sierra Club did not exhaust administrative remedies with regard to its claim that County's mitigation measures are legally infeasible. However, we conclude the evidence is insufficient to support County's findings that its mitigation measures to avoid or lessen potential groundwater level and water quality impacts to neighboring individual wells are effective or feasible, and will reduce those impacts to a level of insignificance. Because the FEIR in this respect does not comply with CEQA, the County's action in certifying the FEIR and approving the project constituted an abuse of discretion. We reverse the order denying Sierra Club's petition for a writ of mandate, remand and direct the superior court to issue a new writ of mandate described below.

FACTUAL AND PROCEDURAL BACKGROUND

For purposes of our substantial evidence review, we state the facts from the entire administrative record before County's planning commission when it approved the project and certified the FEIR. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427 (*Vineyard*).)[2]

_____

2      Though Sierra Club does not challenge the FEIR's organization in this appeal, we note it is difficult to follow. The FEIR does not contain all of the information within the DEIR, and it includes an "errata" as an appendix, showing the changes between the DEIR

3

USG manufactures wallboard and related gypsum products at manufacturing facilities (the plant) in Plaster City, located approximately 18 miles west of the city of El Centro, Imperial County, and it supplies raw material for those operations from its quarry located approximately 26 miles north of Plaster City. USG obtains water for processing and manufacturing, as well as potable and sanitary purposes, from three wells overlying the Ocotillo-Coyote Wells Groundwater Basin (the Basin). The water is delivered via an eight-inch diameter pipeline from the well field, which is located approximately eight miles west of Plaster City.

The Basin is located in western Imperial County and bounded by the Jacumba Mountains to the west, the Coyote Mountains to the northwest, and the United States/Mexico border to the south. The United States Environmental Protection Agency has designated the Basin a sole source aquifer, and it is the only source of potable water for the communities of Ocotillo, Coyote Wells, Nomirage, and Yuha Estates, as well as for USG and other commercial, industrial, and agricultural users. The population of Ocotillo, Nomirage and Yuha Estates, based on the 1990 census and estimated from population growth during the prior decade, is projected to be 670 in the year 2025.

and FEIR. Accordingly, some of County's references to the conclusions of the FEIR in its briefing are actually references to the DEIR or errata. Under the CEQA Guidelines, codified at California Code of Regulations, title 14, section 15000 et seq. (Guidelines), the FEIR must contain either the DEIR or "a revision of the draft" (Guidelines, § 15132, subd. (a)) and so this organization is apparently a permissible way to prepare the FEIR. But it is difficult to maneuver through the documents as they are presented. "The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project. '[I]nformation "scattered here and there in EIR appendices" or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis . . . ." ' " (*Vineyard*, *supra*, 40 Cal.4th at p. 442.)

4

Community water use was approximately 112 acre-feet in 1996, and was predicted as of 2006 to be approximately 120 to 125 acre-feet per year. The water use for Ocotillo, Nomirage and Yuha Estates is projected to be 162.2 acre-feet per year in 2025. Surface water is not present within the Basin and water is not imported into the Basin.

The groundwater quality within the Basin is evaluated by measurement of the total amount of salts and other naturally occurring minerals, referred to as total dissolved solids or TDS. The Basin's groundwater quality is variable at different locations. Some areas of the Basin near Ocotillo produce waters of relatively good quality, with TDS levels of about 300 to 600 milligrams per liter (with 500 milligrams per liter being high-quality, potable water), and other areas, east of Ocotillo, produce highly saline waters, with TDS levels ranging from 600 to over 54,000 milligrams per liter.

Hydrogeologic analysis and conceptual modeling of the Basin indicate that it is a two-layer aquifer system, rather than the single layer used in previous models. The upper layer (layer 1) consists of alluvial deposits with a high water yield and good water quality characterized by TDS of about 400 milligrams per liter, and the lower layer (layer 2), composed of Palm Springs and Imperial formations, is less permeable and has relatively poor water quality, with TDS levels of about 1,000 to 4,500 milligrams per liter. Due to the interaction of certain fault lines, the Palm Springs and Imperial formations have been uplifted in the area east of Ocotillo, and are relatively near the ground surface. In future decades, some potential exists for water quality deterioration in the Ocotillo area as a result of migration of groundwater from layer 2 to layer 1 in the event of continued groundwater level declines in layer 1 at a more rapid pace than in layer 2.

Studies conducted in 1977, 1979, 1987, 1996 and 2004 all conclude that water levels in the Basin have been declining for the past 30 years. These studies, combined with the occurrence of subsurface discharge and the fact existing wells within the Basin do not effectively capture the amount of inflow from precipitation runoff and other sources (referred to as "recharge"), indicate that the Basin is in a condition of overdraft. The California Department of Water Resources defines groundwater overdraft as "the condition of a groundwater basin or subbasin in which the amount of water withdrawn by pumping exceeds the amount of water that recharges the basin over a period of years, during which the water supply conditions approximate average conditions. Overdraft can be characterized by groundwater levels that decline over a period of years and never fully recover, even in wet years."[3]

In 1998, USG proposed to modernize and expand its manufacturing facilities and gypsum quarrying operations, in part by replacing the 8-inch water pipeline from its existing wells with a 10-inch pipe, and drilling a new production water well at the quarry. County issued a negative declaration for the project. Following Sierra Club's successful

_____

[3]    USG asserts that the Basin "is not in 'overdraft' as that term is commonly understood." It points out that due to the gradual decline in the amount of groundwater storage, the EIR concludes that the Basin "may" be in overdraft. But though the Todd report acknowledges that the amount of pumping withdrawal is less than the amount of recharge, it nevertheless concludes—in view of the negative change in storage reflected by all of the prior water balance studies—that the Basin is in a condition of overdraft, and that the proposed project would increase the overdraft over the next 80 years. County's expert, Iris Priestaf, Ph.D., likewise testified before County's planning commission that given the slowly diminishing groundwater levels, "you do have to say that there's overdraft" and that the steady decline existed "maybe not in every corner of this basin, but where it counts, where people's wells are in Ocotillo."

legal challenge, County in 2006 circulated for review a draft EIR, which analyzed the hydrology and the impacts on water quality in areas of the Basin with the assistance of a 2004 groundwater hydrological and modeling study performed by Bookman-Edmonston. Both parties acknowledge that despite the pendency of Sierra Club's appeal, construction of the project was substantially completed by 2001.

As described in the DEIR, the project's objectives as to water supply are to (1) obtain an adequate water supply for operations; (2) potentially replace an old and leaky pipeline; and (3) increase water usage to up to 767 acre-feet annually. More specifically, the project would increase the amount of water pumped from USG's wells at Ocotillo from a baseline of 347 acre-feet per year (the average pumped from 1994 to 1998) to 767 acre-feet per year, an increase in extraction rates of as much as 420 acre-feet per year. Under baseline conditions, i.e., no increased USG pumping, water levels in the Basin would decline by up to 10 feet over the next 80 years (one foot every eight years), and possibly cause a reduction in production rates of some shallower wells. The DEIR predicts that the total water level decline in the aquifer after 80 years would be approximately 30 feet, about 20 feet more than the baseline decline.[4] According to the 2004 Bookman-Edmonston study, because the saturated thickness of the layer 1 alluvial material is about 400 feet, the maximum groundwater level decline after 80 years at the maximum 767 acre-foot per year scenario, is about 8 percent of that alluvial material.

---

[4] Without citing to the record, USG makes the following statement about the 20-foot additional decline in water levels: "In relation to the overall thickness of the alluvial aquifer in the Ocotillo area (approximately 500 feet), this additional drawdown is minimal."

7

The DEIR states that this increased pumping from the alluvial aquifer "will lower the water level over a broad area of the Basin . . . [and] this lowering of water levels will be in addition to the existing condition in the basin where the water table is already declining. Periods of increased rainfall and decreased pumping have not resulted in a Basin-wide recovery of water levels. Thus, the additional decline in water levels caused by the additional pumping of up to 420 [acre-feet per year] . . . can not [*sic*] be readily offset by decreases in pumping elsewhere in the Basin, enhancing recharge, or importing water."

With respect to water quality, the DEIR set forth available long-term water chemistry data from three wells in each of the areas of Ocotillo/Nomirage, Yuha Estates and east of Coyote wells, including one of the USG pumping wells, well No. 5, in the Ocotillo/Nomirage area. The DEIR concludes that pumping of wells for a period of several years at rates of 100 to 200 acre-feet per year in the Yuha area may have a measurable impact on water quality in adjacent wells, and when it occurs, the impact appears rapidly and "persists for many years after pumping ceases."

Sierra Club submitted comments to the DEIR. In part, it invoked the California Constitution, Water Code section 106, and general principles of California water law for the general propositions that "use by overlying users has been considered paramount" and that "the right to pump groundwater for use on lands not overlying the basin are subordinate to the correlative rights of overlying users." Sierra Club asserted the Basin lacked surplus groundwater available for use on parcels other than the overlying property from which it is pumped; and neither case law nor the Water Code supported the DEIR's

8

suggestion that USG's industrial uses should trump overlying domestic needs.  It criticized the DEIR for failing to analyze water supply issues or certify that water supplies would be available for the 80-year life of the project, and for using the same figures of USG's claimed level of past water use that could not be verified.  Sierra Club pointed out the mitigation measures did not identify the expected amount of replacement water needed, any likely source of such water, or the impacts that tapping that water source might have on the environment.

In view of the extensive public comments concerning the increased groundwater pumping and impacts on water levels and quality in the Basin, County retained another company, Todd Engineers, which conducted an independent review of groundwater issues for the project (the Todd report) as well as a water supply assessment pursuant to Water Code sections 10910 to 10912.  The Todd report, issued in 2007, focused on the hydrogeologic setting of the Basin, including the water balance and influence of geologic structures on groundwater flow and quality.  In part, the Todd report concluded that the proposed project's increased pumping would increase the overdraft over the next 80 years, and that this impact was significant and unavoidable.  It also analyzed how the groundwater levels responded to pumping, discussing two individual wells, one in located in Ocotillo (identified as well 16S/9E-25K2 or 25K2) and one located in Yuha Estates (well 17S/10E-11G1 or 11G1), that were subject to increased pumping for export to Mexico.  Both wells responded to the increased pumping with a drawdown of more than 50 feet over five years, but when pumping was suspended, the water levels in the Ocotillo well quickly returned to essentially pre-pumping levels, recovering over 50 feet

9

in two years.  The water levels in the Yuha Estates well had recovered much more slowly however, and still, 30 years later, had not reached pre-pumping levels.  The Todd report concluded that "drawdown impacts due to pumping in the alluvial aquifer (e.g., near Ocotillo) are more localized and recover much faster than comparable drawdown impacts in the older formations near Yuha Estates."

In January 2008, County issued its FEIR, incorporating the Todd report as an appendix.  The FEIR described potential impacts to groundwater both in individual private wells and the Basin as a whole.  Specifically, it stated the increased pumping could (1) reduce water levels, increasing the cost of pumping groundwater and causing some individual wells to go dry and (2) degrade water quality in individual wells, as well as in the Basin as a whole, due to lateral migration of higher-TDS water located to the east of Coyote Wells, lateral migration of higher-TDS water from areas near outcrops of tertiary sediments, or vertical migration of water from or near tertiary sediments underlying the alluvial aquifer throughout most areas of the basin.  County set forth measures, numbered 3.3-1 and 3.3-2, to mitigate the project's groundwater-related impacts on individual wells (both as to water level and water quality) to a level of less than significant, including by having USG provide replacement water supplies under specified circumstances.[5]  The FEIR also includes a groundwater monitoring program,

---

[5]     Mitigation measures 3.3-1 and 3.3-2 are detailed below (part II, *infra*) in connection with Sierra Club's arguments challenging the sufficiency of the evidence of their adequacy.  In the FEIR, County revised its mitigation measures in response to comments, including by limiting mitigation to "existing" wells that demonstrate specified declines in water levels or quality.  It also revised USG's obligation to supply

10

conducted at USG's expense, to provide long-term data regarding the Basin by measuring water levels and collecting samples for water quality analysis from existing United States Geological Service (USGS) wells, eight other existing wells, and two new wells. Private owners with wells in current operation who wish to include their own wells in the program may do so by notifying County within one year of FEIR certification. Because the increased pumping is predicted to accelerate the decline of the groundwater level in the Basin, and may potentially cause the migration of saline water, the groundwater monitoring program objectives are to (1) identify any increases in the rate of water-level decline greater than the baseline rate, and (2) provide an early warning of potential degraded groundwater quality. The water-level and water-quality data, and a statistical analysis of trends, will be submitted to County and the USGS within 60 days of each calendar monitoring period.

With regard to the Basin as a whole, the FEIR concludes the increased pumping from USG's wells would reduce the total amount of water in the Basin, and that if the water quality were to decline in any part of the Basin, it was unlikely there would be a sufficient quantity of non-saline water to restore the water quality. The FEIR concludes these potential water quality impacts on the Basin as a whole are significant and unavoidable, and cannot be feasibly mitigated.

In the FEIR, County included a section of "collective responses" devoted to general concerns submitted by various persons and entities. It responded to comments

replacement water in the event certain substances exceeded drinking water standards, to refer to drinking water standards in force "at the time the Proposed Action is approved," rather than "at the time of the measurement" as the DEIR had originally proposed.

11

concerning groundwater resources in part by pointing to provisions in a groundwater management ordinance (Imperial County Groundwater Management Ordinance § 92201.00, et seq., hereafter the groundwater ordinance or Ordinance). County asserted the groundwater ordinance provided remedies to water users aggrieved by well interference, and gave the board of supervisors authority to adopt, after notice and hearing, reasonable operating regulations on extraction facilities to minimize well interference. County also asserted the groundwater ordinance established priority among groundwater users in the event of existing or threatened overdraft conditions, and that specified overlying domestic uses would have priority over USG's groundwater usage in such event. According to County, these protections supported a conclusion that the potential impacts of the project on groundwater resources would be less than significant after mitigation.

In response to Sierra Club's criticisms concerning replacement supplies of water, County pointed out that the FEIR provided that USG "may, under specified circumstances, elect to provide bottled water to an affected party as a replacement water supply for drinking and cooking purposes" and that "[b]ottled water is generally available for purchase from existing venders serving the region." It stated if USG were to provide a hookup to an existing municipal district or other appropriate water supply system, the water "would likely be produced by another well (or wells) within the Ocotillo-Coyote Wells Groundwater Basin." County further responded that its mitigation, combined with the groundwater ordinance, provided County with authority to take all reasonable and necessary actions to ensure that any impacts of individual wells caused by increased

12

pumping are mitigated to a level of insignificance. County received additional public comments by Sierra Club on the FEIR, including on the project's impacts on groundwater.

In February 2008, County's planning commission certified the FEIR and approved, among other things, a conditional use permit requiring USG to "undertake all mitigation measures identified in the U.S. Gypsum Mitigation Monitoring Reporting Program." It adopted factual findings and a statement of overriding considerations, concluding the project's benefits outweighed its adverse impacts on groundwater resources. (See § 21081, subd. (b); *City of Marina v. Board of Trustees of the California State University* (2006) 39 Cal.4th 341, 368 ["When a public agency has found that a project's significant environmental effects cannot feasibly be mitigated, the agency may nevertheless proceed with the project if it also finds 'that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment' "].)[6]

_____

6      As USG points out, Sierra Club does not challenge the FEIR's conclusion that it is impossible to feasibly mitigate significant impacts on the Basin as a whole, or that the project's benefits outweigh the significant Basin-wide impacts. That conclusion, which would be reviewed for abuse of discretion, "lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned." (*City of Marina v. Board of Trustees of the California State University*, *supra*, 39 Cal.4th at p. 368; see also *San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 13 [a county's decision to approve a project despite its significant environmental impacts "is a discretionary policy decision" that "will be upheld as long as it is based on findings of overriding considerations that are supported by substantial evidence"].) Nor does Sierra Club challenge the FEIR's analysis or determination of the significance of groundwater-related impacts. Finally, Sierra Club abandoned any challenge to the planning commission's findings that the project

13

In February 2008, Sierra Club appealed and the matter proceeded to a hearing before County's board of supervisors. Thereafter, the board of supervisors denied Sierra Club's appeal from the planning commission's decision.

Our prior opinion relating to this matter set forth the procedural history of this case from the filing of Sierra Club's first writ petition in January 1999 to the trial court's January 2010 order dismissing Sierra Club's proceedings challenging the certification of County's EIR. (*Sierra Club v. Imperial County et al.* (May 3, 2011, D056919) [nonpub. opn.].) Our May 2011 decision vacated the trial court's dismissal order and remanded the matter to the superior court for further proceedings. (*Sierra Club v. Imperial County et al.*, *supra*, D056919.)

In April 2012, Sierra Club filed additional papers in support of its objections to County's supplemental return to the court's March 2001 peremptory writ of mandate, and augmented its motion for a supplemental and amended writ of mandate. By these papers, Sierra Club asked the trial court to direct County to set aside its certification of the EIR and approval of the project's mitigation and monitoring measures. In them, Sierra Club argued (1) the FEIR did not describe feasible mitigation measures, and there was no substantial evidence those measures would reduce to a level of insignificance the project's effects on neighboring wells; (2) County did not approve legally feasible mitigation measures in that County had no authority to grant USG rights to extract groundwater superior to those of overlying users, and the adopted mitigation measures

---

alternatives—full or partial use of Imperial County Irrigation District water—are either infeasible (the full use scenario), or have unknown feasibility (partial use scenario). We confine our discussion accordingly.

14

were inconsistent with that law and the groundwater ordinance; and (3) the FEIR's monitoring program was vague and unenforceable.

County and USG jointly opposed the motion. At the hearing on the matter, the trial court heard argument, made findings on the record, and issued its ruling. The court first ruled that Sierra Club was barred from raising one of its challenges to the County's mitigation measures by failing to make clear and specific arguments during the environmental review process. Specifically, it found Sierra Club was precluded from arguing that County's mitigation measures were legally infeasible—that County could not legally impose its mitigation measures because they were inconsistent with (1) California common law relating to overlying and appropriative water rights or (2) section 92204.00 of the groundwater ordinance, which establishes first priority to overlying domestic groundwater uses.[7] Alternatively, the court ruled there was no substantial evidence in

---

[7] The trial court explained in part: "Sierra Club asserts the agencies had no authority to impose mitigation measures that cannot be legally imposed . . . [that] the USG project mitigation measures are clearly not consistent with applicable California common law relating to overlying water rights or with the County's groundwater ordinance. [¶] The petitioner cites the potential possible future physical taking of water in violation of an overlying landowner's superior property rights and groundwater, and . . . the thrust of this challenge [is] a fascinating one, and that is: To what extent should an environmental review and adoption of mitigation measures address and evaluate potential impairment of legal rights beyond your actual impairment of a water user's right to use and enjoy water? I think the thrust of this challenge is: To what extent should an EIR address, evaluate, and balance out a potential impairment to legal rights of others? And I—I think that this is such a large, clearly subrogated issue from the environmental review. It calls into question the impact of the project upon the legal rights of others in the future. I'm afraid I have to find it's the type of an issue that the Sierra Club had a burden to raise clearly and specifically and comprehensibly during the environmental review process. [¶] . . . [¶] This is the type of subject matter that I could easily see under a separate sub-category within the EIR document. There would be an

the record to support Sierra Club's claim that the project or County's adoption of the mitigation measures would impair the legal rights of others.

As for Sierra Club's remaining arguments, the court acknowledged the modeling of the Basin was not perfect due to uncertain hydrological data, but that County, USG and the experts "did the best they could based on the state of the evidence before them." The court ruled the EIR complied with CEQA and that there was substantial evidence the mitigation measures relating to groundwater level and quality were feasible and adequate. Following the hearing, the court issued an order denying Sierra Club's motion for a supplemental and amended writ of mandate and discharging the writ it had originally issued in March 2001. Sierra Club filed this appeal.

## DISCUSSION

### I. *Exhaustion of Administrative Remedies*

A. *Legal Principles*

The Legislature codified the exhaustion of administrative remedies doctrine in section 21177. (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 875.) Subdivision (a) of section 21177 provides in part: "An action or proceeding

---

entire section relating to evaluation of impact upon legal rights of others, and I think the County was deprived of that, by a failure of petitioner to raise it sufficiently." Later in the hearing, after considering further arguments from Sierra Club's counsel concerning how another Sierra Club attorney, Lisa Hamilton, made arguments about the rights of overlying owners, the court further explained: ". . . I'll find a failure to exhaust remedies because in effect the Sierra Club didn't clearly and explicitly tell the environmental reviewers, 'Look, you are trying to adopt a mitigation measure that you're legally not allowed to do, because you will be destroying and impairing water rights of other people who will then claim money damages against you and/or claim that you've taken their land. [¶] In other words, it needed to be that explicit."

16

shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person . . . ."

" 'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.' " (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 527.) " 'The petitioner is required to have "objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." [Citation.] The petitioner may allege as a ground of noncompliance any objection that was presented by any person or entity during the administrative proceedings.' " (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 889-890.)

The purpose of the exhaustion doctrine is to insure the public agency is notified of factual and legal problems and has an opportunity to respond to these potential problems before judicial review. (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198.) This court has observed that " '[t]o advance the exhaustion doctrine's purpose "[t]he 'exact issue' must have been presented to the administrative agency . . . . " [Citation.] While " 'less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding' because, . . . parties in such proceedings generally are not represented by counsel . . .' [citation]" [citation], "generalized environmental comments at public hearings," "relatively . . . bland and general references to environmental matters" [citation], or "isolated and unelaborated

17

comment[s]" [citation] will not suffice. The same is true for " '[g]eneral objections to project approval . . . .' [Citations.]" [Citation.] " '[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.' " ' " (*Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at p. 527.)

Thus, in *Citizens for Responsible Equitable Environmental Development v. City of San Diego*, we held a petitioner failed to exhaust administrative remedies on a claim that a supplemental EIR (SEIR) was required for substantial new information relating to drought or climate change and greenhouse emissions. (*Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at pp. 528-529.) The petitioner's letter to the City council on the date of the CEQA hearings contained only "general unelaborated objections" in that it did not contain the term "drought"; its argument as to decreasing water supply was merely that the City did not follow proper statutory procedure in adopting a water supply assessment; and, as to climate change, it made general assertions that " '[g]lobal climate change has been raised as a significant environmental issue that has been frequently analyzed in current environmental documents,' " and the " 'project will cause direct and indirect greenhouse-gas emissions that, when considered cumulatively, are significant.' " (*Id*. at pp. 527-528, 530.) We concluded the petitioner did not "fairly present" its drought issue to the agency because it merely cited documents buried among thousands of documents on a DVD, and its citation did not indicate the DVD contained information on drought. (*Id*. at p. 528.) Rather, a petitioner must present evidence in a manner that gives the agency an

18

opportunity to respond with countervailing evidence, and the City could not be expected to pore through those documents:  " ' " 'It was never contemplated that a party to an administrative hearing should . . . make only a perfunctory or "skeleton" showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court.' " ' "  (*Ibid*.)  Though the petitioner was entitled to rely on a former councilmember's objection at the CEQA hearing that an addendum to the FEIR did not expressly address drought and the prospect of water rationing, we explained those comments did not satisfy the exhaustion requirement because the councilmember never argued an SEIR was necessary, and thus the issue she raised and the issue on appeal were not "exactly the same."  (*Ibid*.)

Sierra Club has the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level.  (*Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at p. 527.)  This court employs a de novo standard of review when determining whether the exhaustion doctrine applies.  (*Ibid*.)

B.  *Contentions*

Sierra Club contends its legal infeasibility arguments were raised by its representative, Edie Harmon, in her comments to the DEIR and FEIR as well as on appeal to the County board of supervisors, in a manner sufficient to put County on notice that its groundwater management ordinance was implicated in determining appropriate mitigation for USG's augmented groundwater pumping associated with the project.  As support, Sierra Club cites only to a snippet of Harmon's comments to the DEIR regarding

19

groundwater appropriators, and portions of Harmon's March 18, 2008 letter to County's board of supervisors, in which she made several arguments relating to the groundwater ordinance.

USG responds by pointing out that Harmon's comments merely identified deficiencies in the terms and implementation of the groundwater ordinance adopted in 1998. It maintains that Sierra Club, though represented by counsel during the environmental review process, did not bring the legal infeasibility arguments to County's attention so as to allow it an opportunity to address them.

C. *Analysis*

Though Sierra Club has pointed to only limited portions of the record in support of its contentions, we have not so limited our review. That is, we have summarized above Sierra Club's comments in response to the DEIR and FEIR, in addition to Harmon's March 18, 2008 letter cited by Sierra Club in its appellant's brief. Having done so, on our de novo review we are compelled to agree with the trial court that Sierra Club's comments during administrative proceedings with respect to County's mitigation measures do not satisfy section 21177's requirement that the "grounds for noncompliance with [CEQA] [be] presented to the public agency. . . ."

In her March 18, 2008 letter, Harmon argued: (1) the groundwater ordinance did not afford feasible long-term protections to overlying groundwater users either by itself or considered with the mitigation measures; (2) the groundwater ordinance did not include mandatory components of a groundwater management plan and was insufficient to ensure the County would require additional future mitigation if needed; (3) County

20

could not rely on the groundwater ordinance to elevate the priority of industrial export of water over overlying domestic use because it did not include a monitoring program or mitigation measures; (4) County's planning director's decision to accord USG "historic use" priority under the groundwater ordinance was not legally defensible because the groundwater ordinance failed to include certain matters identified in the Water Code; and (5) the planning director lacked authority under California law to grant industrial use a priority above domestic use for overlying property owners.[8] These arguments challenge County's reliance on the groundwater ordinance as *additional* mitigation or a protective measure, not the legal feasibility of mitigation measures 3.3-1 and 3.3-2 set forth in the FEIR (discussed below).

Otherwise, as we have summarized above, Harmon made general references to the rights of overlying users, complained that the DEIR's assertions were not supported by California water law and priority rights, and complained that County was without

---

[8] In connection with the latter point, Sierra Club argued: "[Sierra Club believes] that Water Code [section] 106 and the language of the California Constitution preclude the County from denying the majority of overlying larger residential lots the use of water for domestic purposes so as not to interfere with USG's desired increased industrial off-basin use now. This is because the groundwater basin is already experiencing overdraft according to the DEIR and FEIR . . . . This finding triggers the applicable overdraft priority measures of the County Ordinance." Harmon's comments on the adequacy of the FEIR include similar arguments; she questioned the foundation for the Imperial County planning director's decision to grant USG historic use of 767 acre-feet per year. Harmon asserted there was no evidence USG was actually and continuously using that amount of water before applying for its expansion, and she urged that the planning director's decision as to USG's historic use should be revoked as based on an unsupported and "inflated" claim. Harmon argued the groundwater ordinance did not vest the authority to make the historical use designation in the Planning Director, but vested such authority in the Department of Public Works.

21

authority to rely on the groundwater ordinance to grant USG a superior right to pump up to 767 acre-feet per year as against overlying domestic users.  But none of the comments asserted at the administrative level tied these claims to the *mitigation measures* actually set out in the FEIR or reasonably suggest that those mitigation measures, in view of California water law principles or the groundwater ordinance, were legally incapable of being imposed or legally infeasible.  This is not, as Sierra Club suggests, a matter of Harmon merely omitting a citation to a specific statute or CEQA guideline; it is the absence of arguments fairly apprising the Board that the FEIR's proposed mitigation measures could not lawfully be imposed.[9]  This case presents the same kind of deficiency as in *Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th 515, in which the councilmember expressed concerns

---

[9] In part, Sierra Club cites *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, in which the Court of Appeal, construing section 21080.18, held a school district, in determining its actions were exempt from CEQA, failed to meet its obligation to consider the issue of significant effects and cumulative impacts in determining CEQA exemption.  (*East Peninsula*, at pp. 166-170.)  The district asserted that the plaintiff had failed to exhaust administrative remedies on the issue of cumulative impacts, but the appellate court disagreed, concluding various comments were sufficient to alert the school district "to the fact that its method of analysis was faulty and should be expanded to include analysis of long-term impacts, traffic and safety."  (*Id.* at pp. 175-176.)  We agree with the observation of the Third District in *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, that *East Peninsula* is "of little assistance" to the analysis here.  (*California Native Plant*, 172 Cal.App.4th at p. 619.)  While the plaintiff's comments in *East Peninsula* fairly apprised the school district of the need to address cumulative impacts of the school closure and transfer, including impacts to traffic and safety, the comments of Sierra Club here did not fairly apprise the County that the mitigation measures described in the FEIR are incapable of being imposed because they violate California common water rights law and County's groundwater ordinance, or that they were infeasible as a matter of law.

22

regarding drought and water rationing but did not make the same specific challenge raised by the plaintiffs in the trial court (that an SEIR was necessary due to those conditions).

We have acknowledged that in administrative proceedings, citizens are held to less specificity to preserve an issue for appeal because in such proceedings they are often not represented by counsel. (*Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at p. 527; *Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1138.) But "[i]t is no hardship . . . to require a layman to make known what facts are contested." (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 163; *Evans*, at p. 1138 [despite latitude in specificity during administrative process, affected property owners must make their objections known in some fashion, however unsophisticated].) And, though Harmon submitted comment letters under her own name responding to County's DEIR and FEIR, Sierra Club was in fact represented by counsel during the appeal of the planning commission's decision and at the hearings before the planning commission and board of supervisors. Thus, Sierra Club was held to a higher standard, and was required to make its specific challenges known during the administrative proceedings.

In its reply brief, Sierra Club maintains USG has misstated its arguments for purposes of applying the exhaustion doctrine. According to Sierra Club, its point, assertedly preserved below, is that County is obligated under CEQA to apply "clear public policies favoring overlying groundwater pumpers" and comply with the groundwater ordinance in connection with its approval of the mitigation and monitoring

23

program. It cites case law for the proposition that County has an "obligation, in the context of CEQA, to approve mitigation measures, consistent with the County Groundwater Ordinance's prescription of priorities that are intended to avoid environmental effects to the holders of overlying groundwater rights and that maximize the protection and preservation of the groundwater basin." But the precise argument made by Sierra Club in its supplemental writ petition was that County did not approve, and the FEIR did not describe, legally feasible mitigation measures that would minimize significant impacts. As we have explained above, those arguments were not sufficiently preserved for review.

In sum, with regard to Sierra Club's claims of legal infeasibility of County's mitigation measures, the Board had no opportunity to respond to those " 'articulated factual issues and legal theories *before* its actions [were] subjected to judicial review.' " (*Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at p. 528.) We therefore address only Sierra Club's other challenges to the adequacy of County's proposed mitigation measures.

## II. *Adequacy of Mitigation Measures 3.3-1 and 3.3-2*

Sierra Club challenges the adequacy of County's mitigation measures directed at reducing to a level of insignificance the significant potential impacts to neighboring individual wells. It argues the measures will not minimize and reduce significant adverse impacts of the project on the wells; that the record lacks substantial evidence to support the FEIR's conclusion that the mitigation will reduce potentially significant impacts on those wells to a level of insignificance. It compares the County's mitigation measures to

24

those found deficient in *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099.[10]

Sierra Club sets out three specific criticisms, with some subissues. We first set forth the applicable standard of review, then summarize each of County's mitigation measures, discuss *Gray*, and proceed to separately address each of Sierra Club's challenges.

A.  *Standard of Review*

"The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-391.) "Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits." (*Id.* at p. 391.) Under CEQA, a public agency is required to mitigate or avoid the significant environmental effects of a project that it carries out or approves if it is feasible to do so. (§ 21002.1, subd. (b); *City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th at p. 359.)

---

10    This court disagreed with *Gray v. County of Madera*, *supra*, 167 Cal.App.4th 1099 on other grounds in *Center for Biological Diversity v. County of Santa Barbara*, *supra*, 185 Cal.App.4th at page 889.

This court has explained: "An EIR is required to describe feasible mitigation measures that will minimize significant environmental effects identified in an EIR. [Citations.] Mitigation may consist of a number of measures, including (1) avoiding an impact by not taking certain action; (2) minimizing impacts by limiting the degree or magnitude of the action; (3) rectifying the impact by repairing, rehabilitating, or restoring the impacted environment; (4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; or (5) compensating for the impact by replacing or providing substitute resources or environments." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 495.)

" ' " '[A]n EIR is presumed adequate [citation], and the plaintiff in a CEQA action has the burden of proving otherwise.' " ' [Citation.] In CEQA cases, as in other mandamus cases, 'we independently review the administrative record under the same standard of review that governs the trial court.' [Citations.] We review an agency's determinations and decisions for abuse of discretion. An agency abuses its discretion when it fails to proceed in a manner required by law or there is not substantial evidence to support its determination or decision. [Citations.] 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' " (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275 (*Preserve Wild Santee*); *San Diego Citizenry Group v. County of San Diego*

26

(2013) 219 Cal.App.4th 1, 11-13.) "W]here a petitioner challenges an agency's conclusion that a project's adverse environmental effects are adequately mitigated, we review the agency's conclusion for substantial evidence." (*Preserve Wild Santee*, at p. 275.)

"Substantial evidence for CEQA purposes is 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.] Substantial evidence includes 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.' [Citation.] It does not include argument, speculation, unsubstantiated opinion or narrative, clearly erroneous or inaccurate evidence, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment." (*Preserve Wild Santee*, *supra*, 210 Cal.App.4th at pp. 275-276.)

In determining whether substantial evidence supports a finding, " 'the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' [Citations.] Rather, we must resolve any reasonable doubts and any conflicts in the evidence in favor of the agency's findings and decision." (*Preserve Wild Santee*, *supra*, 210 Cal.App.4th at p. 276; see also *Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at pp. 522-523 [reviewing

27

court may not consider or reevaluate the evidence presented to the administrative agency]; Guidelines, § 15384[11]).)

B. *County's Mitigation Measures*

The FEIR concludes the project's potential significant impacts on individual wells would be mitigated to a level of insignificance via two mitigation measures intended to address declining water levels and water quality, respectively numbered 3.3-1 and 3.3-2.

Mitigation measure 3.3-1 provides that if, as a result of USG's increased pumping as determined by County's planning commission, water levels in an existing well decrease faster than the baseline rate (one foot every eight years) and the average water levels in the surrounding wells decrease for more than two consecutive years with a "documented reduction" in available water to an affected user, USG at its election will either (1) rehabilitate the well and/or install a new pump to restore the prior pumping rate; (2) provide an incremental replacement of water of like quantity and quality equivalent to the amount of the reduced rate of pumping; (3) provide a full replacement water supply of like quantity and quality at a cost not exceeding the cost to the affected party at the time of impact; or (4) deepen the existing well or provide a new replacement well drilled to a depth that will not be affected by existing or future project-related water table declines, and capable of providing an equivalent quantity and quality of water that

---

11    "The CEQA Guidelines, promulgated by the state's Natural Resources Agency, are authorized by section 21083 and found in title 14 of the California Code of Regulations, section 15000 et seq. . . . In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 448, fn. 4.)

existed before impact. If USG elects to provide replacement water or a replacement water supply, it must mitigate "until groundwater levels return to a level equal to the projected baseline condition or ten years after USG reduces its pumping from the Basin to the baseline rate, whichever first occurs."[12]

Mitigation measure 3.3-2 provides that if the County planning commission, after review of water quality data, determines that increased pumping caused the TDS level in any existing well to exceed 500 milligrams per liter (the secondary drinking water standard), or caused the concentration of sulfate, chloride or boron to exceed drinking-water standards in force at the time the increased pumping is approved, then USG will provide the affected party or parties with an alternative supply of water for drinking and

_____

[12] In full, mitigation measure 3.3-1 reads: "If the water level in an existing well in the Ocotillo area decreases at a rate faster than one foot every eight years and the average water levels in the surrounding wells also decrease for more than two years in a row due to the Proposed Action, as measured from the interpolated linear of one foot every eight years with a starting reference point being the date that pumping by USG increases above the baseline rate, and there is a documented reduction in the available water to the affected user, then USG, at its election will: (1) Rehabilitate the well and/or install a new pump to restore the prior pumping rate; or (2) Provide an incremental replacement of water equivalent to the amount of the reduced rate of pumping by the affected party, of a like quantity and quality; or (3) Provide a full replacement water supply to the affected party of a like kind and quality, at a cost that does not exceed the cost to the affected party at the time the impact occurred; or (4) Deepen the existing well or provide a new replacement well to the affected party, drilled to a depth that will not be affected by existing or future Project-related declines in the water table, and capable of providing an equivalent quantity and quality of water that existed prior to the impact. The extent to which the Proposed Action will be considered to be the cause of the decrease in water levels in the Ocotillo area will be determined only after a review of the water level data and a decision by the Imperial County Planning Commission. If USG elects to provide replacement water or a replacement water supply, arrangements must be made to provide this mitigation until groundwater levels return to a level equal to the projected baseline condition or ten years after USG reduces its pumping from the Basin to the baseline rate, whichever first occurs."

cooking, which "could be bottled water or a hookup to a replacement water source," at no cost to the affected party or parties. If the increased pumping causes the TDS level to exceed 1,000 milligrams per liter, USG will provide the affected party or parties with a "hookup to a replacement supply of water" which "may be a hookup to an existing municipal district or other appropriate drinking water system." The measure requires USG to provide an alternative water supply "until (1) concentrations of the above-listed constituents in excess of applicable water-quality standards return to levels below such standards or until the water quality parameters, for which there is data that currently exists, return to pre-Proposed Action levels, or (2) ten years after USG reduces its pumping from the Ocotillo/Coyote Wells Groundwater Basin to the baseline rate, whichever first occurs."[13]

---

[13]    In full, Mitigation measure 3.3-2 reads: "USG will provide an alternative or replacement source of water if the water quality significantly deteriorates in any existing well in the Ocotillo area and such deterioration is caused by the Proposed Action. As discussed above, the secondary drinking water standard for TDS is 500 mg/L and water with a TDS level in excess of 1,000 mg/L is considered non-potable. Therefore, if the Proposed Action causes the TDS level in any existing well to exceed 500 mg/L, or causes the concentration of sulfate, chloride or boron, as described in the Groundwater Monitoring Program, to exceed its drinking-water standard that is in force at the time the Proposed Action is approved, then USG will provide the affected party or parties with an alternative supply of water for drinking and cooking, at no cost to the affected party or parties. This alternative supply could be bottled water or a hookup to a replacement water source. If the TDS level in any well exceeds 1,000 mg/L and is caused by the Proposed Action, then, the water quality will be such that use of the water for any domestic purpose will be significantly affected due to scale buildup, damage to plumbing, corrosion, and other similar impacts. If the TDS level exceeds 1,000 mg/L and is caused by the Proposed Action, USG will provide the affected party or parties with a hookup to a replacement supply of water. This replacement supply may be a hookup to an existing municipal district or other appropriate drinking water supply system. USG will bear the full cost of the hookup. The affected party or parties, however, would only be

30

C.  *Deferral of Mitigation and Gray v. County of Madera*

"Formulation of mitigation measures should not be deferred until some future time.  However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way."  (Guidelines, § 15126.4, subd. (a)(1)(B); see *Preserve Wild Santee*, *supra*, 210 Cal.App.4th at p. 280.)  Any such deferral "requires the agency to commit itself to *specific performance criteria* for evaluating the efficacy of the measures implemented."  (*POET, LLC V. California Air Resources Board* (2013) 218 Cal.App.4th 681, 738.)  Thus, in *Preserve Wild Santee*, this court concluded that, while an EIR's plan for habitat management of an open space preserve contained measures to mitigate the loss of a specific butterfly habitat, the EIR was nevertheless deficient because it did not describe guidelines or specific performance criteria, i.e., the actions anticipated for active management.  (*Preserve Wild Santee*, at p. 280.)  This was problematic because the timing and specific details for implementing the management activities were subject to

responsible for the annual cost of the replacement water equivalent to their costs to pump water prior to the occurrence of the impact.  If the annual cost of water for the replacement supply exceeds the affected party or parties costs [*sic*] to pump water prior to the occurrence of the impact, USG will pay the incremental difference.  The extent to which the Proposed Action will be considered to be the cause of the decrease in water quality in the Ocotillo area, will be determined only after a review of the water quality data and a decision by the Imperial County Planning Commission.  If USG is required to provide alternative and/or replacement water supply pursuant to the terms of this mitigation measure, it must continue to do so until (1) concentrations of the above-listed constituents in excess of applicable water-quality standards return to levels below such standards or until the water quality parameters, for which there is data that currently exists, return to pre-Proposed Action levels, or (2) ten years after USG reduces its pumping from the Ocotillo/Coyote Wells Groundwater Basin to the baseline rate, whichever first occurs."

the preserve manager's discretion based on prevailing environmental conditions, and they were not guaranteed to occur at any particular time or any particular manner. (*Id*. at p. 281.) We acknowledged that " '[a]n EIR is inadequate if "[t]he success or failure of mitigation efforts . . . may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR." ' " (*Ibid*.; see also *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 670 [appellate court held mitigation allowing future formulation of land management aspects of mitigation was an improper deferral; the fact future management plans would be prepared only after consultation with wildlife agencies did not cure "these basic errors under CEQA"]; *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 93 [final EIR deficient because it "merely proposes a generalized goal of no net increase in greenhouse gas emissions and then sets out a handful of cursorily described mitigation measures for future consideration that might serve to mitigate the [project's significant environmental effects]"]; compare *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 941-943 [mitigation measures to reduce impacts on special plant species were adequate because they required formal consultation with a federal agency under a particular section of the Endangered Species Act, and 80 percent of any transplants to be established within three years]; *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028-1029 [upholding EIR that set forth a range of mitigation measures to offset significant traffic impacts where performance criteria would have to be met, even though further study was needed and EIR did not specify which measures had to be adopted by city].)

32

The court in *Gray v. County of Madera*, *supra*, 167 Cal.App.4th 1099 addressed the improper deferral of mitigation in a context of potentially significant groundwater quantity and quality impacts. *Gray* concerned an EIR certified by a county board of supervisors for a project allowing the real party in interest, Baker, to develop a quarry in Madera County, which involved grants of conditional use permits for hard rock mining and an asphalt plant, as well as rezoning from agricultural to quarry, mining and drilling use. (*Gray*, at pp. 1105-1106.) The area around the project would continue to be used primarily for cattle grazing and contained dozens of residences as well as 55 domestic wells within one mile from the project. (*Id*. at p. 1106.) In a staff report, the county planning commission expressed concern that over the mine's life time and as a result of the mining operations, surrounding property owners might suffer declined well pumping rates. (*Ibid*.) The DEIR for the project stated the project could cause declines in water levels and pumping rates in adjacent private wells, and also could cause degradation of groundwater and/or surface water quality from the operations. (*Id*. at p. 1112.)

The EIR set forth three mitigation options in the event of an adverse impact on water levels of neighboring private wells: Baker would (1) rehabilitate or deepen the private wells; (2) provide incremental replacement water by providing a connection to the project's water system; or (3) provide full replacement water by providing a connection to the project's water system. (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th at p. 1115.) Another mitigation measure, as it was amended, required a hydrology study and allowed the option of building a " 'water system constructed under federal, state, and county guidelines' " to supply potable water to affected neighbors. (*Id*. at p. 1116.) The

33

latter option, however, was not discussed or analyzed in the DEIR or FEIR, and there was no indication it had ever been extensively discussed with county staff or Baker. (*Ibid.*)

The appellants challenged the EIR's approval, contending in part that the proposed mitigation measures were inadequate to address the potential and significant impact of the project on water resources, and the county violated CEQA by failing to recirculate the EIR after amending its mitigation measures relating to water concerns. (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th at pp. 1111, 1115, 1120.)

The Court of Appeal held there was no substantial evidence to support the EIR's conclusion that the proposed mitigation measures were feasible or effective in remedying the potentially significant problem of water level decline of neighboring wells. (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th at p. 1116.) In particular, the mitigation measures were not viable because (1) the measure permitted Baker to rehabilitate or deepen the neighboring wells to provide additional water, but there was no evidence those wells would provide additional potable water, and the DEIR conceded the water from the project wells was not acceptable for consumptive uses; (2) the mitigation measure did not require Baker to treat the project well water; (3) providing replacement water through bottled water was not effective in that the FEIR did not explain how it would address fluctuating water usage of neighboring landowners or how or in what

34

amount the bottled water would be delivered to neighboring landowners;[14] and (4) the measures improperly deferred mitigation.  (*Gray*, at pp. 1117-1119.)

As for the question of deferral, the *Gray* court rejected the county's arguments that it had committed to a mitigation goal of remedying the decline in water levels of private wells and listed the mitigation alternatives, thus complying with CEQA.  (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th at p. 1119.)  It explained:  "While we generally agree that CEQA permits a lead agency to defer specifically detailing mitigation measures as long as the lead agency commits itself to mitigation and to specific performance standards, we conclude that here the County has not committed itself to a specific performance standard.  Instead, the County has committed itself to a specific mitigation goal—the replacement of water lost by neighboring landowners because of mine operations.  However, this goal is not a specific performance standard such as the creation of a water supply mechanism that would place neighboring landowners in a situation substantially similar to their situation prior to the decline in the water levels of their private wells because of the mining operations, including allowing the landowners

---

14    The court explained:  "The measure requires replacement at least equal to the lost amount of water production from the landowners' wells.  However, some if not all of the landowners will have fluctuating water usage.  In some weeks, they may use a lot of water because of drought conditions, extra guests, or farming needs.  In other weeks, landowners may use very little water.  Often, landowners will be unable to predict their amount of water needs in advance.  It is also unlikely that neighboring landowners have water meters that will help them to calculate their water usage. . . .  A water system, as proposed by the Board, could solve this problem.  However, the proposal for a water system was never studied by the county staff.  Thus, there is no substantial evidence that it is feasible to build a water system.  Therefore [the mitigation measure] does not present viable mitigation options."  (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th at p. 1118.)

35

to use water in a substantially similar fashion to how they were previously using water. Moreover, the listed mitigation alternatives must be able to remedy the environmental problem. We have concluded that the listed mitigation alternatives, except for the building of a new water system, cannot remedy the water problems because they would not place neighboring landowners into a situation substantially similar to what the landowners experienced prior to the operation of the mine. And the option to build a water system, which is the only effective mitigation measure that was proposed if it was feasible, was never studied or examined. Thus, the County is improperly deferring the study of whether building such a system is feasible until the significant environmental impact occurs." (*Ibid*.) The appellate court concluded: "In order to mitigate [the decline in water levels of neighboring wells] into a less than significant problem, Baker must present a viable solution that can effectively replace the decline in the water available to the neighboring residents. Although Respondents contend that we should defer to the Board's finding that the mitigation measures are effective, we decline to do so where the Board's findings are not supported by substantial evidence or defy common sense." (*Id*. at p. 1116.)

D. *Provision of Replacement Water*

Advancing arguments similar to those made by the petitioners in *Gray v. County of Madera*, *supra*, 167 Cal.App.4th 1099, Sierra Club contends there is no substantial evidence to support County's finding that mitigation measure 3.3-1, permitting USG to supply replacement water of "like kind and quality," will reduce the potential impacts on existing individual wells to a level of insignificance. Sierra Club argues the FEIR

36

contains no discussion of the feasibility of finding such replacement water; that there is no explanation how up to 112 acre-feet per year will be supplied by other wells in the already overdrafted Basin; there is no determination of those wells' unused pumping capabilities; and providing replacement water from unspecified USG wells or other wells in the same Basin is a "non-solution" and infeasible because it could exacerbate the problems in overdraft and water quality rather than mitigate them. Sierra Club states the DEIR makes it clear that there are no community water supply systems that domestic water users can hook into, and there is no evidence in the record that USG can provide replacement water from wells either inside or outside of the Basin that is of " 'similar or better quality and available when needed.' " Further, Sierra Club argues, the FEIR does not discuss the environmental impacts of using existing or new wells drawing from the Basin for replacement water supply purposes.

As for mitigation measure 3.3-2, permitting USG to provide individual well owners with a hookup to a replacement supply of water via " 'an existing municipal district or other appropriate water supply system,' " Sierra Club contends there is no examination of where the alternative supply will come from; what, if any, existing municipal districts exist; or the feasibility of providing individual hookups to each affected well owner for the replacement water source.

USG seeks to distinguish *Gray*. It asserts there is no evidence to suggest it would be infeasible to deepen, rehabilitate, or replace any well that could potentially be affected by the Project. It asserts that "if for some reason an affected well could not be deepened or rehabilitated, replacement water is available." For this assertion, USG points to

37

County's responses in the FEIR to Sierra Club's comments on the DEIR, providing in part: "The amount of replacement water that may need to be provided under [mitigation measure 3.3-2] will depend on the characteristics of the affected well and other factors that are unknown at this time. However, [the measure] evinces a commitment to achieve a performance standard that will ensure that the potential impact of the Proposed Action on individual wells will be reduced to a level of insignificance. . . . [¶] Pursuant to the provisions of Mitigation Measure 3.3-2, USG may, under specified circumstances, elect to provide bottled water to an affected party as a replacement water supply for drinking and cooking purposes. Bottled water is generally available for purchase from existing vendors serving the region. In the event that USG elects (or is required) to provide a hookup to an existing municipal district or other appropriate water supply system, the water would likely be produced by another well (or wells) within the Ocotillo-Coyote Wells Groundwater Basin."

There is little difference between the deficient mitigation measures in *Gray* and County's measures in this case. The primary deficiency is that, to the extent the mitigation measures require USG to provide replacement water, they do not ensure USG will provide that water in such a way that permits residents the ability to use it in substantially the same manner as the water it replaces. As in *Gray*, *supra*, 167 Cal.App.4th at p. 1117, County proposes that USG rehabilitate or deepen individual affected wells if those wells demonstrate a specified decrease in water levels, but the FEIR does not explain whether or how, in view of already declining water levels at baseline rates and the potential for water quality impacts, a rehabilitated or deepened well

38

will provide water of the same quantity and quality.  Nor does the record contain such evidence.  The FEIR does not identify which, if any, municipal water districts have water available or if, and under what circumstances, such districts have agreed to provide water to USG.  Like in *Gray*, County proposes to supply bottled water from existing vendors to affected parties for drinking and cooking, or by providing a hookup to another well within the same basin, but this measure, as written, is ineffective mitigation for the reasons expressed in *Gray*: the measure does not explain how or in what amount the bottled water will be delivered to the neighboring landowners or how USG will address fluctuating water usage.  (*Gray*, 167 Cal.App.4th at pp. 1117-1118.)

As to impacts for which mitigation is known to be feasible, an EIR may give the lead agency a choice of which measure to adopt, but the measures must be "coupled with specific and mandatory performance standards to ensure that the measures, as implemented, will be effective."  (*Communities for a Better Environment v. City of Richmond*, *supra*, 184 Cal.App.4th at p. 94.)  We have explained that mitigation measures for potential significant environmental impacts violate CEQA where they merely state "generalized goals" to mitigate a significant effect without committing to such specific criteria or standards of performance.  As in *Gray v. County of Madera* and *Preserve Wild Santee*, *supra*, 210 Cal.App.4th 260 dealing with improper deferral of mitigation, County's proposed mitigation measures state only a general goal of replacing water with like quality and quantity from water supply systems or hookups that are unidentified and not further detailed.  Incremental or full replacement of water "of like quantity and quality" is not a specific performance criterion.  (Accord, *Gray*, *supra*, 167

39

Cal.App.4th at pp. 1118-1119; *POET, LLC v. California Air Resources Board*, *supra*, 218 Cal.App.4th at p. 739 [testing program and rulemaking to establish specifications to ensure there is "no increase in NOx" emissions is not a specific performance criterion].) The measures are deficient because they are "nonexclusive, undefined, untested and of unknown efficacy." (*Communities for a Better Environment v. City of Richmond*, *supra*, 184 Cal.App.4th at p. 91 [final EIR put forth mitigation plan to ensure the project's operation " 'shall result in no net increase in GHG [greenhouse gas] emissions over the Proposed Project's baseline' " and included a requirement that the applicant hire and fully fund a " 'qualified independent expert' " to complete an inventory of greenhouse gas emissions, as well as other proposals such as " 'Add/improve heat exchangers,' " and " 'Initiate carbon sequestration, capture and export' "; such mitigation was deficient because it "merely proposes a generalized goal of no net increase in greenhouse gas emissions" and a "handful of cursorily described mitigation measures for future consideration" that were "nonexclusive, undefined, untested and of unknown efficacy"].)

Further, as Sierra Club points out, the FEIR does not address the additional potential environmental impacts of drawing Basin water from deepened or rehabilitated wells, hooking residents up to existing or new wells within the overdrawn Basin for replacement water supply purposes, or the potential environmental effects associated with using and delivering water bottles to residents. These flaws are similar to those in *Save Our Peninsula Committee Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99. In *Save Our Peninsula*, the county certified an EIR for a residential development project located within a watershed served by well water, in an area characterized by

40

severe water shortages. (*Id*. at pp. 108, 115.) The county's EIR for the project had indicated that increased water pumping over baseline would be mitigated either by reducing the project density or reducing pumping elsewhere in the basin. (*Id*. at p. 128.) The EIR, however, did not identify an offsetting pumping location until well after the comment period had closed, and when the applicant finally did identify the offsetting parcel of land, there was no discussion of information about the parcel or the impacts of transferring water credits. (*Id*. at p. 130.) The trial court found the project's approval was not supported by the evidence, and the Court of Appeal agreed, pointing out former Guidelines section 15126 (now Guidelines § 15126.4, subd. (a)(1)(D)[15]) required a discussion of the impact of mitigation measures, as well as growth-inducing impacts. (*Save Our Peninsula*, 87 Cal.App.4th at p. 130.) It directed the trial court to order a revised EIR to include a discussion of the offsetting parcel, the history of water pumping on the property and its feasibility for providing an actual offset for increased pumping on the project property, and the growth-inducing effect of a policy of offset pumping reduction in the area. (*Id*. at p. 131.)

USG urges us to hold that its mitigation measures reflect a "firm commitment" to comply with viable measures to ensure groundwater impacts are reduced to an insignificant level. It argues that *Gray* reflects only the appellate court's concern about adequate access to *potable* water, in view of the fact that the EIR in *Gray* had conceded

---

[15]    "If a mitigation measure would cause one or more significant effects in addition to those that would be caused by the project as proposed, the effects of the mitigation measure shall be discussed but in less detail than the significant effects of the project as proposed." (Guidelines, § 15126.4, subd. (a)(1)(D).)

41

that water from project wells (one of the mitigation options) was not acceptable for consumptive use.  But the *Gray* court's sufficiency of the evidence analysis was not limited to water quality impacts.  The *Gray* court expressly rejected the proposed solution for the potentially significant problem of the decline in *water levels* of the neighboring wells; common sense informed the court that the mitigation measures would not effectively replace the water in that it would not enable neighboring landowners to use water in substantially the same manner that they were accustomed to doing if the project had not caused a decline in the water levels of their wells.  (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th at p. 1117.)

USG further argues that because its own wells are deep and located in the thickest part of the layer 1 aquifer, providing potable water from its own wells to adversely affected well-owners (which would be subject to the 767 acre-foot maximum and require a corresponding reduction in USG's water usage) is "clearly viable."  There are several flaws with this argument.  First, mitigation measure 3.3-1 does not obligate USG to provide replacement water from its own pumping wells.  Second, USG's argument is essentially that given the aquifer's size, USG's pumping (which at the maximum 767 acre-feet per year is double the baseline rate) will not affect the aquifer.[16]  But in response to USG's comments to the DEIR, County's own groundwater hydrology expert, Andrew Kopania, pointed out USG made a "misleading mathematical assertion" that pumping of up to 767 acre-feet per year represents only one-tenth of one percent of the

---

16    See also footnote 4, *ante*.

groundwater stored in the Basin, assuming the Basin holds 1.2 million acre-feet of water. Noting that the 1.2 million acre-feet includes both fresh and saline water, Kopania states: "The Proposed Project, however, is planned to last for 80 years. Pumping at up to 767 [acre-feet per year] for 80 years (61,360 [acre-feet]) actually represents over five percent of the assumed basin volume of 1,200,000 AF. Thus, over 80 years, USG will use one twentieth of the total water available in the basin, according to [Bookman-Edmonston's] estimate, and a significantly greater volume of the fresh water in the basin."

Though County found mitigation measures 3.3-1 and 3.3-2 would render the water quantity and quality impacts less than significant, we reject this finding because there is not substantial evidence that these mitigation measures are viable or effective, and they do not satisfy CEQA's requirements.

E. *10-Year Mitigation Period*

Sierra Club complains that the adopted mitigation measures, including USG's obligation to provide replacement water or a replacement water supply, fail to require USG to provide for the overlying user's domestic needs for longer than a 10-year period after increased groundwater pumping ends, even if water levels or quality continue to be adversely impacted. It argues the record is "replete" with concerns of County hydrology experts that impacts could exist 10 years after the project ceases operations. As support, Sierra Club points to an August 2005 memo by Kopania, in which the author, after meeting with the County and USG and acknowledging the 10-year termination of monitoring, stated: "Without continuing some sort of groundwater monitoring program until the impacts return to a level below significance, . . . it would not be possible to

43

determine when the mitigation measures can cease." Kopania recommended that the duration of monitoring be tied to the duration of the mitigation necessary to return to a less-than-significant condition. Sierra Club argues USG cannot rely on Dr. Priestaf's conclusion that 10 years was an appropriate time frame for full recovery and mitigation. It maintains Dr. Priestaf's testimony is without foundation and contradicted by the conclusions in the Todd report. Citing an additional September 2005 memorandum by Kopania, Sierra Club maintains there is substantial expert evidence that it might take much longer than 10 years to restore water quality if pumping causes a significant impact.

USG responds that Sierra Club ignores substantial evidence that a 10-year time period is sufficient for recovery of affected wells, and that the board was entitled to rely on Dr. Priestaf's expert opinion and other evidence, including from USG's responses to comments, that the mitigation would reduce the project's potential impacts on individual private wells to a level of insignificance. It rebuffs Sierra Club's foundational challenge to Dr. Priestaf's testimony, stating, "Nothing in Dr. Priestaf's testimony remotely suggests that she may have been addressing a 'pumping scenario' other than the one proposed by [USG] and studied in the EIR."

The question is not whether there is substantial evidence in the record to support Sierra Club's position concerning the adequacy of imposing a 10-year duration on mitigation in the event of significant impacts, it is whether the record lacks substantial evidence to support the contrary conclusion. And, it is Sierra Club's burden to "*affirmatively show* there was no substantial evidence in the record to support the

44

[Board's] findings"; that burden will not be met if Sierra Club simply points to portions of the administrative record that support its position. (*California Native Plant Society v. City of Rancho Cordova*, *supra*, 172 Cal.App.4th at p. 626; *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 526.) Sierra Club can meet its burden by setting forth all of the evidence material to the Board's finding, and then showing that that evidence could not reasonably support the finding. (*California Native Plant Society*, at p. 626.) The substantiality of evidence is not undermined by differing expert opinions. (Guidelines, § 15151 ["[d]isagreement among experts does not make an EIR inadequate"]; *California Native Plant Society*, at p. 616.) "Moreover, 'a public agency may choose between differing expert opinions. [Citations.] An agency may also rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence.' " (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 900.) Thus, the fact Kopania, or other experts, felt a 10-year mitigation period was inadequate is not enough to set aside the FEIR. We assess below whether substantial evidence supports the adequacy of a 10-year duration of mitigation for the project's significant impacts on groundwater.

1. *10-Year Duration of Mitigation for Individual Well Water Level Impacts*

At the hearing before the County board of supervisors, Dr. Priestaf testified that a 10-year duration of mitigation would be an appropriate time frame for full recovery of individual well water levels: "We looked at what they called water balance studies. . . . [A] water balance study for a ground water basin looks all the in flows, rainfall, stream flow . . . looks at all of the outflows. For example, pumping, and then it looks at the

45

change in storage in the ground water basin, and, so, when we looked at those water balances, they were done by U.S.G.S., Bookman[-]Edmonston and other researchers. They all document recharge. So there is recharge to this ground water basin. [¶] Now, when it comes to the pumping for the export to Mexico, there was a comment made about wells that had not yet recovered. Well, in the Yuha [Estates] area where there was some of this pumping the wells are still recovering, and what that reflect is the particular hydrogeologic conditions around you. That is in what we call layer 2, which is a less permeable [aquifer] zone. Layer 1 is the [aquifer] zone that U.S. Gypsum will be pumping out of the Ocotillo area. Now, in that area when the pumping for Mexican export stopped, water levels recovered, and in fact in one of the wells that had been pumped it recovered over 50 feet in less than two years. [¶] So, based on this understanding we have of the water balance and the recharge, based on this evidence of recovery in the Ocotillo area after the Mexican export, then it is my opinion that ten years is an appropriate time frame for full recovery and the mitigation measure."

Contrary to Sierra Club's cursory, footnoted, argument, Dr. Priestaf's conclusion as to the adequacy of a 10-year period of mitigation has some foundation, and is supported by substantial evidence in the supplemental record, namely, the relatively quick, two-year recovery of water levels in Ocotillo well 25K2 after cessation of pumping to Mexico as reported by Bookman-Edmonston in its 2004 study. That study (and the DEIR) includes the data of well 25K2 from hydrographs showing water level as it changes over time, and the FEIR incorporates those conclusions. CEQA and its implementing regulations provide that "expert opinion supported by facts" may constitute substantial evidence;

46

argument, speculation, unsubstantiated opinion or narrative, clearly inaccurate or erroneous factual statements may not. (§ 21080. 2, subd (c); Guidelines, §§ 15064, subd. (f)(5), 15384 [defining substantial evidence as used in the Guidelines].) As we have stated, we may not set aside an agency's approval of an EIR on grounds an opposite conclusion would have been equally or more reasonable. (*San Diego Citizenry Group v. County of San Diego*, *supra*, 219 Cal.App.4th at p. 11.) And, in order to challenge the FEIR for insufficient evidence, Sierra Club must " ' "lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal." ' " (*Id*. at p. 12.) We will not independently review the record to make up for Sierra Club's failure to carry its burden. (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934-935.) Sierra Club has not met its burden to affirmatively show Dr. Priestaf's expert opinion is speculative, unsubstantiated or clearly inaccurate or erroneous, and we decline to find the FEIR inadequate on Sierra Club's stated ground.

Our conclusion does not change in view of Sierra Club's reference in reply to a hydrograph showing that one well, 36H1, located close to USG pumping, showed a four-foot steeper decline in levels from 1995 to 2005 than described in the FEIR. It points out that while there was some recovery in that well from 2005 to 2006, the recovery then leveled off. According to Sierra Club, this recovery "may have been atypical" and is not substantial evidence that the recovery rate of affected wells will be sufficient to bring them to pre-project levels in 10 years. Our role is not to reweigh the evidence supporting or contradicting Dr. Priestaf's conclusion, this would be the sort of second guessing that

47

we are not permitted to do on appeal. (*Vineyard*, *supra*, 40 Cal.4th at p. 435 [court cannot " 'determine who has the better argument' "].)

2. *10-Year Duration of Mitigation for Individual Well Water Quality Impacts*

Our conclusion is different as to the FEIR's imposition of a 10-year duration of mitigation for water *quality* impacts.

As to water quality, the FEIR acknowledges USG's increased pumping, and states: "Based on a comparison with past impacts in the Basin, the proposed increased groundwater extraction rates for the Project could have an impact on water quality." The FEIR continues: "As discussed, water levels are decreasing throughout most of the Basin and are expected to decrease further from the Proposed Project. As the depth to groundwater decreases, the saline water that is present at the water table may eventually reach the screened interval of some wells. Several wells have relatively short screened intervals, so that the saline water present at the water table could appreciably affect the quality of the water in certain wells." According to the FEIR, though a significant potential for lateral migration of saline water from east of Coyote Wells into Ocotillo is unlikely, there is a small potential for upward migration of saline from tertiary sediments underlying the aquifer in the Ocotillo area. The FEIR states that the geologic model "was not able to accurately reproduce the change in water quality caused in both Ocotillo and Yuha Estates by the pumping for export to Mexico." The FEIR's "collective" response to comments sets forth recent water quality data but it does not explain how, or in what time frame, cessation of USG's increased pumping will result in a reversal of the potentially significant impact to water quality within neighboring private wells.

48

During her February 2008 presentation to the County planning commission, Dr. Priestaf addressed water quality impacts and the potential for inferior water within layer 2 to migrate into the more permeable layer 1 alluvium. When asked about mitigation of that impact, she replied: "Well, the mitigation at this point includes, you know, continued monitoring. But to reverse a situation like that would very likely include a decrease in pumping or a redistribution of pumping.

With respect to the 10-year duration for mitigating water quality proposed by USG and incorporated into the FEIR, Kopania in March 2008 responded to USG's comments as follows: "[USG's] statement that '*By the* [*tenth*] year *after cessation of projection operations, based on current knowledge and data, it is reasonable to assume that the impacts of the project would be reduced to a level of insignificance*[,]' is contrary to the analysis in the EIR/EIS and the existing data from the basin. For example, the increase in TDS in the Ocotillo/Nomirage area that occurred as a result of McDougal pumping for a 10-year period from 1974 to 1984 [was] at a rate that averaged only one-third of the proposed increase in pumping by USG. The TDS levels increased by 60 percent and, 20 years later, are still approximately 30 percent higher than pre-pumping TDS concentrations. The data from the basin indicate that appreciable declines in pumping rates do not reverse prior declines in water levels and that it may take much longer than 10 years to restore water quality if pumping causes a significant impact to water quality." A similar criticism to the reasonableness of the 10-year limitation was made by Matthew Weidlin, a certified hydrogeologist, on Sierra Club's behalf. He recommended that the

49

same process used to determine if mitigation was necessary be used to determine when it could end.

Mitigation measure 3.3-2 does not include a decrease in pumping or redistribution of pumping. Though Dr. Priestaf stated such reduction or redistribution would be needed to remedy impacts in water quality, she did not give any indication as to the time frame necessary to restore water quality to pre-project measurements. In short, the record lacks substantial evidence that County's 10-year duration of mitigation for water quality is effective or adequate.

F. *Reduction in USG's Augmented Pumping as Additional Mitigation*

Sierra Club contends the County erred by failing to consider as additional mitigation a requirement of "marked reduction in USG's augmented pumping" once threshold impacts occur. It maintains County should have implemented such mitigation in light of the groundwater ordinance, which according to Sierra Club, subordinates use of exported water for commercial operations to overlying domestic uses in Ocotillo.

USG responds initially that Sierra Club's contention is made without authority, and we agree that in the absence of some supporting regulation, guideline or case law, we must reject this challenge to the FEIR. In any event, CEQA does not require discussion of every possible mitigation measure or measures the agency rejects as infeasible. (*San Diego Citizenry Group v. County of San Diego*, *supra*, 219 Cal.App.4th at pp. 15-16.) " ' " '[F]easibility' under CEQA encompasses 'desirability' to the extent that desirability is based on a reasonable balancing of the relevant economic, environmental, social, and

50

technological factors." ' "  (*Id*. at p. 17.)  We cannot speculate whether, or why, County may have concluded a marked reduction in USG pumping was infeasible under this test.

We observe the FEIR includes a separate section discussing the groundwater ordinance and its protections for overlying domestic users.  It points out the ordinance contains dispute procedures for water users suffering well interference or infringement of groundwater use by other users (Ordinance, § 92201.13), and gives specified overlying domestic users priority over USG's groundwater use in the case of existing or threatened overdraft in the Basin.  (Ordinance, § 92204.00.)  It explains that in March 2006, County, pursuant to the ordinance, granted USG registrations for its three existing wells, and that 767 acre-feet would be the maximum amount of groundwater combined for the wells.  The FEIR concedes that, "Pursuant to these regulations, overlying domestic uses either (a) legally existing on the effective date of the Groundwater Ordinance, or (b) developed thereafter on property zoned "R-1" or "R-2" on the effective date of the Groundwater Ordinance, *would have priority over USG's groundwater usage in the case of an existing or threatened overdraft of the Ocotillo-Coyote Wells Groundwater Basin*."  (Italics added.)[17]

---

[17]    In addition, the FEIR provides:  "The Groundwater Ordinance provides the County with various regulatory tools that are designed to avoid or minimize the impact of existing and proposed groundwater extraction activities on groundwater resources and other users.  For example, Section 92201.13 provides a remedy for water users who are aggrieved by 'well interference' (defined as a substantial water level decline in a short time period in a localized area caused by extraction) or other impairment or infringement of the groundwater use caused by the extraction activities of another party.  In such cases, the [planning commission] may issue any order that it determines necessary to provide the petitioning water user with an adequate remedy.  Additionally, pursuant to Section

An EIR is an informational document that we review for good faith and substantial compliance. (*Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 390; *San Diego Citizenry Group v. County of San Diego*, *supra*, 219 Cal.App.4th at p. 13.) We conclude the FEIR sufficiently informs the public of the existence of the groundwater ordinance, explains that USG is subject to its provisions, and that USG will subordinate its water use to that of overlying users in case of an existing or threatened overdraft in accord with the groundwater ordinance's provisions.

G. *Mitigation to Water Quality Standards in Effect at Time of Project Approval*

Sierra Club criticizes mitigation measure 3.3-2, which requires USG to provide an alternate supply of water for drinking or cooking if the concentration of sulfate, chloride or boron exceeds drinking water standards "in force at the time the Proposed Action is approved." It argues the impacts are not sufficiently mitigated because USG was not required to mitigate to standards in effect at any time during or even after the project's 80-year duration. Sierra Club also maintains the measure is ambiguous regarding the applicable benchmark because the project was approved in 1998, not when the FEIR was certified in 2008. Sierra Club argues: "[C]onsistent with the obligation to provide the Ocotillo pumpers with water of like kind and quality, and consistent with the Ground Water Ordinance, the County erred when it did not explicitly require USG to provide

92202.07, the Board of Supervisors, after notice to the public and hearing, may adopt reasonable operating regulations on extraction facilities to minimize well interference. This portion of the Groundwater Ordinance further supports a conclusion that the potential impacts of the Project on neighboring wells will be less than significant after mitigation. [¶] Chapter 4 of the Groundwater Ordinance establishes priority among groundwater users in the event of existing or threatened overdraft conditions."

drinking water meeting water quality standards in effect at the time water quality degradation begins to occur, rather than at the time in 2008 . . . ."

USG responds that the standards set forth in measure 3.3-2 reflect the criteria described in the groundwater monitoring program, and were used in the FEIR as thresholds of significance for determining whether the project will degrade water quality in an individual well. It argues the measure unambiguously refers to standards in effect in 2008. USG asserts we should summarily reject Sierra Club's argument because it has not cited and cannot cite authority for the proposition that County is required to mitigate impacts to "unspecified and presently unknown standards."

There is authority for the proposition that a project's required compliance with specific laws or regulations may serve as adequate mitigation of environmental impacts in appropriate situations. (1 Kostka & Zischke, Cal. Environmental Quality Act (2d ed. 2012) § 14.15, p. 702; *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906 ["a condition requiring compliance with regulations is a common and reasonable mitigation measure, and may be proper where it is reasonable to expect compliance"]; *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 308 [same].) Sierra Club's argument is more specific, directed at the need to mitigate to current drinking water standards, not just those in place at the time of project approval. But in view of our obligation to apply the principle that an EIR is presumed adequate (*San Diego Citizenry Group v. County of San Diego*, *supra*, 219 Cal.App.4th at p. 13; *Santee*, *supra*, 210 Cal.App.4th at p. 275), it is not enough for Sierra Club to merely argue, without providing some supporting regulation, guideline, or case authority, that

53

adequate mitigation pertaining to water quality must require compliance with water quality standards in effect at any time during the project's duration. Without some support for its argument, Sierra Club has not met its burden to show the County prejudicially abused its discretion in approving mitigation measure 3.3-2. (Accord, *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 208-210 [plaintiffs' argument, " 'there is a lack of evidence as to whether [a mitigation measure] will be effective and reduce any impacts to less than significant,' " and other arguments made without supporting detail, did not demonstrate substantial evidence was lacking and plaintiff forfeited the arguments]; *Tracy First v. City of Tracy*, *supra*, 177 Cal.App.4th at pp. 935-936 [argument that an EIR did not follow energy consumption standards of CEQA, without authority or analysis, does not establish a city prejudicially abused its discretion based on lack of substantial evidence].)

H. *Claim that Mitigation is Limited to Existing Wells*

Sierra Club complains that the proposed mitigation measures apply only to existing wells in the Ocotillo area, and make no provision for development, including new or replacement wells, on lands of overlying owners. USG responds with several arguments. It maintains the County is not required to mitigate "speculative impacts on future wells" in that section 21060.5 of CEQA requires only that an EIR evaluate a project's potential impacts on " 'the physical conditions which *exist* within the area which will be affected by a proposed project . . . .' " (Italics added.) It argues future development was considered in the 2004 Bookman-Edmonston report, which factored in residential growth in the communities overlying the Basin and assumed a tripling of the

54

population over the project's 80-year life. Finally, USG argues impacts on future wells is subsumed in the FEIR's evaluation of the project's unavoidable impacts on the Basin as a whole, and because Sierra Club has not challenged the conclusions within the statement of overriding considerations, it has waived any argument about the correctness of those conclusions.

We do not read County's mitigation measures in the limiting manner suggested by Sierra Club. Mitigation measures 3.3-1 and 3.3-2 require USG to perform certain mitigation to the extent the planning commission determines that water levels decrease or quality deteriorates in an "existing well in the Ocotillo area" by specified criteria and due to USG pumping. This language does not limit USG's mitigation efforts to only those wells in existence *at the time of project approval*. To the extent USG seeks to interpret the FEIR, CEQA or its guidelines to exclude from its mitigation obligations wells put into existence during the 80-year project duration, it is incorrect. And, as USG evidently acknowledges, such an interpretation is inconsistent with the FEIR's projections as to foreseeable future population growth in Ocotillo and the surrounding communities,[18] which would necessarily be accompanied by the creation of additional wells. Such wells

---

[18] The water supply assessment prepared for County states: "To obtain future demand through the life of the USG project, population was assumed to increase by 1.4 percent each year from 1990 to 2082. The 1.4 percent rate of population increase was based on the observed annual population growth from 1980 to 1990. While this growth rate is reasonable on the time scale of 10 or 20 years, it likely overestimates the future population of the area as projected to 2082 when it would result in more than tripling of the population."

will be subject to USG's mitigation obligations, if and when the mitigation triggering conditions are met.

Sections 21151 and 21060.5, cited by USG, concern determining whether CEQA applies to a project, and the type of impacts triggering the need for an EIR. Thus, section 21151, subdivision (b) requires preparation of an EIR on projects that may have a "significant effect on the environment," meaning "substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5." Section 21060.5, in turn, provides that " '[e]nvironment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." These sections say nothing about an agency's mitigation measures or obligations, and they do not restrict the scope of such measures to physical conditions existing at the time of project approval.

III. *Remedy for CEQA Violations*

"When a court finds that a public agency failed to comply with CEQA, it must do one or more of the following: (1) mandate that the agency vacate the determination, finding, or decision in whole or in part; (2) if the court finds that a specific project activity will prejudice the consideration or implementation of mitigation measures or project alternatives and could result in an adverse physical environmental change, mandate that the agency and any real party in interest suspend specific activity until the agency complies with CEQA; (3) mandate that the agency take specific action necessary to comply with CEQA. (§ 21168.9, subd. (a).) The court must specify what action by the

56

agency is necessary to comply with CEQA (§ 21168.9, subd. (b)) but cannot direct the agency to exercise its discretion in a particular way (§ 21168.9, subd. (c))." (*Federation of Hillside & Canyon Associations v. City of Los Angeles, et al*. (2000) 83 Cal.App.4th 1252, 1266; see also *Preserve Wild Santee*, *supra*, 210 Cal.App.4th at pp. 286-287.)

Section 21168.9 gives trial courts flexibility in tailoring a remedy to fit a specific CEQA violation, including by allowing a court to mandate the suspension of project activities that might adversely affect the environment and prejudice the consideration or implementation of mitigation measures or project alternatives until the public agency complies with CEQA. (*Preserve Wild Santee*, *supra*, 210 Cal.App.4th at pp. 288-289.) A trial court need not mandate that the public agency decertify the EIR and void all related project approvals in every instance where an EIR is found to violate CEQA. (*Id.* at p. 288.) Though we reverse the judgment in part and direct the trial court to grant Sierra Club's petition as to the adequacy of mitigation measures 3.3-1 and 3.3-2, we leave it to the trial court to issue an appropriate writ, but at minimum it must direct the County to remedy the FEIR's deficiencies by identifying and describing mitigation measures that could reasonably be expected to reduce the significant environmental impacts on water levels and quality in individual wells, in a manner that complies with CEQA. (§ 21100, subd. (b)(3); Guidelines, § 15126.4.).


DISPOSITION

The order is reversed to the extent it denies Sierra Club's petition for writ of mandate on the issue of the adequacy of mitigation measures 3.3-1 and 3.3-2. The matter

57

is remanded to superior court with directions to enter a new order granting the petition as to that issue, and ordering Imperial County to remedy the FEIR's deficiencies so that it identifies and describes mitigation measures that could reasonably be expected to reduce the significant environmental impacts on water levels and quality in individual wells, in a manner that complies with CEQA. The order is affirmed in all other respects. Sierra Club is awarded costs on appeal.


O'ROURKE, J.

WE CONCUR:


NARES, Acting P. J.


HALLER, J.